Hoyt Franklin CLINES, James William HOLMES,
Darryl V. RICHLEY and Michael Ray ORNDORFF
*v.* STATE of Arkansas

CR 82-54                                    656 S.W.2d 684

Supreme Court of Arkansas
Opinion delivered July 5, 1983
[Rehearing denied October 3, 1983.*]

---

*DUDLEY, J., would grant rehearing.

*Marshall N. Carlisle; Donald R. Huffman,* Public Defender; *Priscilla Karen Pope;* and *Thomas J. Tucker,* for appellants.

*Steve Clark,* Atty. Gen., by: *Dennis R. Molock* and *Alice Ann Burns,* Dep. Attys. Gen., for appellee.

Steele Hays, Justice. These four appellants were jointly tried and convicted of the January 8, 1981 capital murder of Don Lehman, a Rogers householder, and of the aggravated robbery of his wife and daughter. They were sentenced to death by electrocution on the capital murder charge and to life sentences on the two aggravated robbery

charges. On appeal they allege a number of errors of law and procedure as grounds for reversal. Finding no error, we affirm the convictions and the sentences imposed.

## I.

## THE TRIAL COURT ERRED IN FINDING THE ARKANSAS CAPITAL MURDER STATUTE CONSTITUTIONAL.

Appellants make a four-fold attack on the constitutionality of the Arkansas felony murder statute, Ark. Stat. Ann. § 41-1501 (1) (a) (Repl. 1977), which provides that capital murder occurs if a person, acting alone or with others, commits one of several felonies, including robbery, in the course of which either he or an accomplice causes the death of any person under circumstances manifesting extreme indifference to the value of human life. Appellants argue that the statute is vague and overbroad; that it denies equal protection of the law inasmuch as there are currently twenty-three men, but no women, on death row; that the imposition of the death penalty is arbitrary and capricious because the prosecuting attorney is given discretionary power to waive the death penalty and because the jury must return a death verdict if they find aggravating circumstances outweigh mitigating circumstances; and finally that our statutory scheme does not require the jury to consider the culpability of each individual defendant.

The vagueness argument has been raised and answered more than once. In *Cromwell* v. *State,* 269 Ark. 104, 598 S.W.2d 733 (1980), we pointed out that in the definition of criminal offenses some generalization is both unavoidable and desirable so that prosecutors and juries may have leeway to lighten the punishments that might be imposed for conduct that falls within overlapping offenses. (See *Cromwell* at p. 107).

The claim that the equal protection clause of the constitution is offended because men are given the death penalty disproportionately to women is raised initially on appeal and, beyond that, is supported by argument alone.

We disagree that juries are bound under our statutory scheme to return a verdict of death if they find aggravating circumstances outweigh mitigating circumstances. We have pointed out in several cases that whatever the jury may find with respect to aggravation versus mitigation, it is still free to return a verdict of life without parole, simply by finding that the aggravating circumstances do not justify a sentence of death. (See *Williams* v. *State,* 274 Ark. 9, 621 S.W.2d 686 [1981], and Ark. Stat. Ann. § 41-1302 [2] [c]). Additionally, because the capital murder statute and the first degree murder statute overlap in appropriate cases, the jury may refuse consideration of both the death penalty and life without parole, by returning a guilty verdict as to the charge of murder in the first degree. *Wilson* v. *State,* 271 Ark. 682, 611 S.W.2d 739 (1981). This jury had that option.

The argument that prosecutorial discretion in seeking the death penalty is arbitrary and capricious has been dealt with by the Supreme Court of the United States (*Bordenkircher* v. *Hayes,* 434 U.S. 359 [1978]); and by us (*Miller* v. *State,* 269 Ark. 341, 605 S.W.2d 430 [1980]). It needs no further review.

The claim that our statutory scheme does not require the jury to separately weigh each defendant's role in a crime involving capital murder, so as to determine individual culpability, might be disposed of on procedural grounds, as the argument was not clearly raised below, i.e. we find no objection to the capital murder instructions, nor did the appellants tender to the trial court an instruction consistent with their view of the law. *Schwindling* v. *State,* 269 Ark. 388, 602 S.W.2d 639 (1980). However, we choose to consider the merits of the argument.

Appellants cite *Enmund* v. *Florida,* ___ U.S. ___, ___ S. Ct. ___, 73 L. Ed. 2d 1140 (1982). There, the Supreme Court held that death was a cruel and unusual punishment for one who had participated in a robbery during which murders were committed, but was not present at the killings and did not intend that the victims be killed. The court noted that the record supported no more than an inference that Enmund, the petitioner, was the person waiting in a car near

the scene of a robbery. Two others had gone to the rear of a nearby farmhouse and, on a pretext of having car trouble, coaxed the victim outside to rob him. When the victim called for help his wife came out and shot one of the robbers. The two victims were killed in a gun battle and the robbers fled with their money to a waiting car.

Relying on the Eighth Amendment, the court held that one who does not intend that a robbery victim be killed, is not present when the killing occurs, and does not contemplate that lethal force will be used in carrying out the robbery, is not subject to the death penalty. A Florida jury had found Enmund and a co-defendant guilty and recommended the death penalty for both defendants, which the trial court imposed. Acknowledging the absence of any direct evidence that Enmund was present at the killings, the Supreme Court of Florida affirmed, explaining that the interaction of the felony murder rule and the law of principals combine to make a felon generally responsible for the lethal acts of his co-felons. As it did with the death penalty for rape (see *Coker* v. *Georgia*, 433 U.S. 584 [1977]), the court reasoned that an overwhelming number of states and of American juries would repudiate the death penalty for crimes such as Enmund's.

Significant comments are in the opinion, first, that there was no evidence that Enmund had any intention of participating in, or facilitating, a murder and, second, the court emphasized that "[i]t would be very different if the likelihood of a killing in the course of a robbery were so substantial that one should share the blame for the killing if he somehow participated in the felony." Here, a number of distinguishing factors immediately appear. At about 9:45 p.m., after he and his family had retired for the evening, Don Lehman answered a knock at his front door. He asked who was there and someone answered "David." His daughter, Vickie, also responding to the knocking, said as her father unlocked the door the four appellants, masked and armed, burst into the room with such force that her father was knocked backward off his feet and the doorknob of the front door was jammed through a closet door behind. Two or three of the appellants struggled with her father toward the

bedroom, where Mr. Lehman was wrestled onto the bed and a fatal shot to the head and one to the abdomen were delivered.

There was direct evidence from more than one source that appellants had discussed among themselves the necessity of murder if they met resistance; at least two of the appellants were armed with pistols, perhaps three of them, and the fourth with a lethal weapon fashioned from a metal chain. All four wore ski masks and all four burst into the Lehman home when the latch was opened. The proceeds, some $1,200, were presumably divided to the appellants' liking. It must be noted, too, that Lehman was given no opportunity to yield, he was immediately attacked by appellants, sustaining blows to his head and face from the metal chain and a mortal wound to the chest before reaching the bedroom.

Although perhaps only two of the appellants were in the bedroom when Mr. Lehman was killed, it cannot be ignored that when a group of individuals agree to execute a criminal enterprise involving the forced, nighttime entry of a private dwelling, known to be occupied, wearing masks and armed with pistols, intent on robbery, it follows that murder is a most probable consequence. We think the likelihood of a homicide under the circumstances is so substantial as to bring this case clearly within the quoted exception of the *Enmund* decision, on those circumstances alone. Added to that is the evidence that murder was plainly contemplated by the appellants. We conclude the blame for Don Lehman's murder rests with near equality on all of the appellants.

As a final response to this phase of the argument, we point out that there are added safeguards in our system against the arbitrary imposition of the death penalty. In *Collins* v. *State*, 261 Ark. 195, 548 S.W.2d 106 (1977), we noted the power of the trial court to reduce a death sentence to life imprisonment and in that opinion we committed this court to a policy of comparative review, by examining the death penalty in every case on a comparable basis. We have demonstrated our readiness to modify the death sentence

where it is imposed capriciously (see *Sumlin* v. *State,* 273 Ark. 185, 617 S.W.2d 372 [1981]), or where the culpability of co-felons is disproportionate (see *Henry* v. *State,* 278 Ark. 478, 647 S.W.2d 419 [1983]), or where death is unduly harsh under the circumstances (*Neal* v. *State,* 274 Ark. 217, 623 S.W.2d 191 [1981] and *Giles* v. *State,* 261 Ark. 413, 549 S.W.2d 479 [1977]).

We are not overlooking the suggestion that Michael Orndorff's participation in the crime was half-hearted; that he may have asked to be taken home as the appellants were leaving the Baker residence; and that after the shooting he disclaimed any wish to be involved in a murder. But the jury unanimously rejected as a mitigating factor that any appellant played a minor role. Too, Orndorff's request to be taken home may have been due to Steve Baker's having declined to go along, rather than because of any compunctions over the undertaking. And his belated comment that he didn't want to be a part of a murder must be judged from the standpoint that it came *after* the fact and against the uncontradicted proof that he burst into the Lehman home along with the others, masked and intent on robbing, killing, if need be, anyone who resisted. We need not repeat what we have already said about the shared culpability for Don Lehman's death under the circumstances of this case. To selectively exclude this appellant from the penalty imposed by the jury for conduct readily assumed by all of them would be to arbitrarily excuse him from the predictable consequences of his own actions, consequences which the proof showed he expressly recognized.

## II.

### THE TRIAL COURT ERRED IN REFUSING TO GRANT A SEPARATE TRIAL FOR EACH DEFENDANT.

Prior to the adoption of the Arkansas Rules of Criminal Procedure in 1976, defendants in capital cases were entitled to severance as a matter of right pursuant to Ark. Stat. Ann. § 43-1802 (Repl. 1977). However, A.R.Cr.P. Rule 22.3 superseded § 43-1802 and gives discretion to the trial court to try

the defendants jointly in capital cases. *Hallman and Martin v. State,* 264 Ark. 900, 575 S.W.2d 688 (1979).

Appellants submit that our recent decision in *McDaniel and Gookin* v. *State,* 278 Ark. 631, 648 S.W.2d 57 (1983), requires a reversal of this case, but the argument cannot be sustained. There are fundamental differences between the two cases and in *McDaniel* we did not disturb the rule that severance of defendants rests within the sound discretion of the trial court. We pointed out that such discretion is broad, though to be exercised judiciously in capital cases, with careful scrutiny to be given to a number of elements which could affect the fairness of the trial. (See *McDaniel and Gookin* v. *State,* page 638). In *McDaniel,* the defenses of the defendants were utterly antagonistic, each defendant claiming the murder was committed unexpectedly by the other. No such similarity exists here. It is argued that the defenses in this case are antagonistic, but that claim cannot be supported. We find no effort among the defendants to point to another defendant as the murderer; the proof on behalf of each defendant (only one of whom testified) was aimed for the most part at proving he was not in the bedroom, where the murder occurred. These defenses are not in the least antagonistic in the same sense as in *McDaniel.*

The final and essential difference is that the *McDaniel* case had the added element that where culpability was distinctly disproportionate, the jury was admittedly unable to decide which of the two defendants committed a heinous act, resulting in two defendants being convicted of a capital crime for which only one may have been guilty. Whereas here, there is substantial evidence, indeed overwhelming evidence, that all four appellants planned and executed a robbery, expressly deliberating on murder as a possible consequence. Nothing in this record suggests that for these appellants to be tried jointly resulted in substantial injustice and we find no abuse of discretion in the trial court's refusal to grant separate trials.

## III.

### THE USE OF A DEATH QUALIFIED JURY IN THE INSTANT CASE DENIED THE APPEL-

LANTS AN IMPARTIAL JURY ON THE ISSUES OF GUILT AND PUNISHMENT AS REQUIRED BY THE SIXTH AND FOURTEENTH AMEND-MENTS TO THE CONSTITUTION.

The gist of this argument is that when those members of a jury panel holding religious or conscientious scruples against capital punishment are eliminated, the cross-section of the population which remains is not impartial and unbiased on the issues of guilt and punishment. They are, it is urged, favorable to the prosecution and, hence, guilt prone. The argument is not new and needs no reiteration. It has been considered and rejected here as well as in the Supreme Court of the United States. *Witherspoon* v. *Illinois,* 391 U.S. 510 (1968); *Miller* v. *State,* 269 Ark. 341, 605 S.W.2d 430 (1980).

## IV.

## THE JURY SELECTED IN THE INSTANT CASE WAS NOT SELECTED IN ACCORDANCE WITH THE STANDARD PRESCRIBED IN *WITHER-SPOON* AND *HOBBS.*

The *Witherspoon* rule, as interpreted in *Hobbs* v. *State,* 273 Ark. 125, 617 S.W.2d 347 (1981) permits the exclusion of persons as prospective jurors *only* if they irrevocably oppose or favor the death penalty regardless of the evidence. Appellants insist that two of the veniremen, Mrs. Kaiser and Mrs. Dick, should not have been excused for cause because of their uncertainty as to capital punishment and Mr. Harley Wood, who showed some preference for it, should have been excused for cause.

We have examined the questions asked in voir dire and the responses given and, typically, no clear conclusion can be drawn. The answers are tentative or equivocal, and the trial court is in a better position than we are to gauge the attitude of the veniremen and decide whether each will weigh the evidence and, if appropriate, will consider all the penalties provided by law. We cannot say his discretion was used wrongly in any instance complained of. *Hulsey* v.

*State,* 268 Ark. 312, 595 S.W.2d 934 (1980); *McCree* v. *State,* 266 Ark. 465, 585 S.W.2d 938 (1979).

## V.

### THE TRIAL COURT ERRED IN LIMITING THE APPELLANTS TO A TOTAL OF TWELVE PEREMPTORY CHALLENGES.

The trial court limited the four defendants to a total of twelve peremptory challenges, which they claim is error. We have held in three cases that where defendants are tried jointly each defendant is not entitled to the full allotment of peremptory challenges, but a challenge by one is a challenge by all. *Williams* v. *State,* 267 Ark. 527, 593 S.W.2d 8 (1979); *Lewis* v. *State,* 220 Ark. 914, 251 S.W.2d 490 (1952); *Hearne* v. *State,* 121 Ark. 460, 181 S.W.2d 291 (1915).

No absolute right to peremptory challenges exists under the constitution, *see Stilson* v. *United States,* 250 U.S. 583 (1919), and we see no prejudice resulting from the position we have taken in the earlier decisions. The right to challenge a prospective juror on peremptory grounds may be exercised simply because counsel has reservations that certain groups might be skeptical of its theory of the case; it is a very general response and such criteria as occupation, education, age, residence, social background, sex, and even facial expression, may influence its use, depending on the nature of the case. But ordinarily these considerations are applicable to the defendants as a whole and not individually. Here, it appears the peremptory challenges were exercised collectively by the defense, as might be expected, and no argument is offered that for a specific reason one prospective juror was objectionable to one of the defendants, though not to the others. We adhere to our holding in *Williams* v. *State, supra.*

## VI.

### CALLING A FIVE DAY RECESS AT THE CLOSE OF TESTIMONY WAS AN ABUSE OF THE COURT'S DISCRETION.

Appellants allege that it was an abuse of discretion for the trial court to order a five day recess as the trial was nearing a close. The recess occurred, evidently, between the taking of testimony and the instructions and arguments, because of the trial judge's scheduled participation in a meeting of the Arkansas Judicial Council. The trial seems to have commenced well in advance of the meeting, but moved at a slower pace than expected. Such matters as recesses and sequestration of the jury are not amenable to inflexible rules and must be governed to a great extent by the exigencies of the day and the calendar. We see no reason why it would work to the appellants' greater prejudice to recess from Wednesday to Monday, than from Friday to Monday, as often occurs in trials. We find no abuse of discretion.

## VII.

IT WAS ERROR FOR THE JURY TO FIND THE AGGRAVATING CIRCUMSTANCE THAT, "IN THE COMMISSION OF THE CAPITAL MURDER, EACH OF THE APPELLANTS KNOWINGLY CREATED A GREAT RISK OF DEATH TO A PERSON OTHER THAN THE VICTIM."

Citing *Williams* v. *State*, 274 Ark. 9, 621 S.W.2d 686 (1981), appellants contend that because Vickie Lehman and Virginia Lehman were victims of the underlying felony of aggravated robbery to the capital murder of Don Lehman, the evidence will not warrant a finding as an aggravating circumstance that appellants knowingly created a great risk of death to a person other than the victim. Appellants assert that *Williams* v. *State* supports the argument, but fail to explain how. The holding there has no particular relevance to this case. Williams' death sentence was reduced because one of the aggravating circumstances found by the jury, commission of a prior felony, did not involve violence as required by Ark. Stat. Ann. § 41-1303 (Repl. 1977). The decision also holds that where a jury finds no mitigating circumstances and three aggravating circumstances, one of which is erroneous, we will not regard the error as harmless simply because two aggravating circumstances remain, as

we are not in a position to speculate as to what a jury would do on a finding of two aggravating factors instead of three.

The appellee submits that this point was not preserved by an objection to the instructions or to the verdict forms. Without implying that the point is otherwise meritorious, we decline to consider it for the lack of proper objections.

## VIII.

### IT WAS ERROR FOR THE TRIAL COURT TO PERMIT THE INTRODUCTION OF EVIDENCE OF OTHER CRIMES AND ACTS AGAINST APPELLANTS CLINES AND ORNDORFF.

Mrs. Tammy Baker was called by the state to prove that the appellants had been at her home the evening of the Lehman murder, drinking beer and playing cards with her husband, Steve Baker. She said when she answered the door the four appellants were there, that one was wearing a ski mask and stuck a gun in her face. She was ordered to "stick 'em up", before realizing that a joke was being played. The four stayed until about 9:30 p.m. and she overheard discussions involving the robbery of someone who lived nearby.

On cross-examination she was asked by counsel for one of the defendants, Clines, whether her husband was then facing charges of robbery committed the night before the Lehman crime. She said he was and was then asked if any of the appellants were involved and she said Orndorff and Clines were. Orndorff's objections to this line of questioning were overruled and when Steve Baker followed his wife to the stand the state was permitted to go into the incident in greater detail.

Appellants Clines and Orndorff complain that the admission of this evidence, as well as a statement by Billy Weaver that Darrell Richley told him he was the one who shot Don Lehman, that he had been involved in "stealing and robbing," violate the rule against admitting evidence of prior bad acts, citing *Alford v. State,* 223 Ark. 330, 266 S.W.2d 804 (1954). But the Weaver comment was admitted

with an admonition to the jury in accordance with the purposes of Rule 404 (b), Uniform Rules of Evidence, and the Baker testimony has to be examined in light of the fact that it was Clines' lawyer who pointedly asked the questions that brought the evidence into the trial. Whether the object was to discredit Tammy and Steve Baker's testimony by showing that Baker was charged with similar conduct is speculation, but we are not persuaded that reversible error occurred. It is entirely possible that the evidence would have been received by the trial court under Rule 404 (b) had it been offered for the purpose of proving identity, opportunity, intent, preparation, or absence of mistake. Certainly the evidence of a robbery involving similar methods committed in close timing with the offense on trial had probative value. The prejudicial aspect is not so obvious that we can say the court was clearly wrong.

## IX.

IT WAS ERROR FOR THE COURT TO ALLOW THE JURY, IN THE SENTENCING PHASE, TO FIND APPELLANTS CLINES AND ORNDORFF HAD "PREVIOUSLY COMMITTED ANOTHER FELONY, AN ELEMENT OF WHICH WAS THE USE OR THREAT OF VIOLENCE TO ANOTHER PERSON OR CREATING A SUBSTANTIAL RISK OF DEATH OR SERIOUS PHYSICAL INJURY TO ANOTHER PERSON" ON THE UNCORROBOR-ATED TESTIMONY OF AN ACCOMPLICE.

After the appellants' guilt had been established and the penalty phase of the trial was in progress the state was permitted to prove one of the seven aggravating circumstances listed in Ark. Stat. Ann. § 41-1303 (Repl. 1977) by the testimony of Steve Baker that he, Clines and Orndorff had previously committed another felony by the use or threat of violence. Baker said the three of them robbed Barry Cobbs and Tim Pettyjohn at gunpoint on January 7, 1981.

Appellants charge that since Steve Baker was an accomplice in the alleged robbery the penalty procedure violated the rule incorporated in Ark. Stat. Ann. § 43-2116,

that a conviction cannot be had in any case upon the testimony of an accomplice unless there is corroboration by other evidence. As Steve Baker's testimony was not corroborated, appellants claim that error resulted. The argument cannot be sustained, if for no other reason than the fact that § 43-2116 deals with grounds for *conviction*, whereas § 41-1303 deals with proving that a crime of violence was previously *committed*. Beyond that, in *Miller* v. *State, supra,* we held that the same degree of proof is not required to sustain a finding that an aggravating or mitigating circumstance exists, as would be required to sustain a conviction if that circumstance was a separate crime. (*Miller* at p. 355). We said that if there was evidence of an aggravating or mitigating circumstance, however slight, it is sufficient to submit that issue to the jury.

## X.

### THE TRIAL COURT ERRED IN ADMITTING THE TENNIS SHOES OF THE APPELLANT CLINES.

We need not delay unduly with the issue raised by this argument, as the admission of the evidence itself was of little or no consequence. An investigating officer testified that he took an impression of a foot print from a flower bed of the Lehman home; that there was a high degree of probability that it matched Hoyt Clines' tennis shoe, however, he said it was impossible to be absolutely certain. But Clines' presence at the scene in company with the other appellants was amply evidenced by other proof and no objection to this evidence was offered until the trial, as required by A.R.Cr.P. Rule 16.2.

## XI.

### THE TRIAL COURT ERRED IN NOT GRANTING A MISTRIAL FOR TESTIMONY CONCERNING IMPLICATING OUT-OF-COURT STATEMENTS OF A CO-DEFENDANT, DARRYL V. RICHLEY, REGARDING APPELLANT CLINES.

Freddie Baker was called by the state to prove that Darryl Richley came to his home a day or two after the crime

involving the Lehman family to ask his help in selling the guns taken from the Lehman home. Richley, he said, talked about his part in the murder, and told him four of them went to the door with ski masks and "busted on in", that one of the four started whipping Lehman with a motor chain belt, who made a break for the bedroom "and the guy pulled his mask off and kept hitting him. He said he got on the bed and that [Richley] shot him and said the guy kept going for a gun above the bed and he said he put the gun up to his head and shot him." The questioning continued at length, with no other reference to the removal of a mask, and not until the state fully completed its interrogation was any objection made. At that point counsel for Hoyt Clines moved for a mistrial on the grounds that there was previous testimony that it was Clines who had removed his mask and hence Clines was deprived of his right to confront opposing witnesses. This argument lacks merit, as objections must be timely, *Earl* v. *State,* 272 Ark. 5, 612 S.W.2d 98 (1981), and mistrials should be declared *only* when the trial court is certain the trial cannot, in fairness, continue. *Floyd* v. *State,* 278 Ark. 86, 643 S.W.2d 555 (1982).

## XII.

THE EVIDENCE OBTAINED FROM THE SEARCH OF APPELLANT RICHLEY'S CAR AND APART-MENT SHOULD HAVE BEEN SUPPRESSED, BECAUSE THE SEARCH WARRANT WAS NOT BASED ON PROBABLE CAUSE AND THE CON-SENT TO SEARCH GIVEN BY RICHLEY WAS NOT GIVEN VOLUNTARILY.

Appellant Richley urges that the affidavit for the search warrant was deficient in that no underlying circumstances for the affiant's conclusions were stated. He also argues that his consent was not voluntary. However, the search warrant and affidavit are not abstracted, as required by our rules, and the trial court found the appellant did give a lawful consent to the search. An independent determination of that issue has been made on review and we are satisfied the trial court's finding was entirely consistent with the evidence, particularly in view of Richley's testimony.

Finally, under A.R.Cr.P. Rule 36.24, and our Rule 11 (f), we find the treatment of other objections of appellants which were overruled, as well as rulings adverse to appellants, do not constitute reversible error. On a comparative basis we are not disposed to say the death penalty in this case is so wantonly, arbitrarily or freakishly imposed, or so excessive in relation to the crime, that we are compelled to modify the verdicts. There was sufficient evidence to support the findings of aggravating circumstances which were not outweighed by mitigating circumstances. We are satisfied the jury's verdict was relatively free of passion or prejudice. Accordingly, the judgments and sentences are affirmed.

DUDLEY, J., concurs in part, dissents in part.

PURTLE, J., dissents.

ROBERT H. DUDLEY, Justice, concurring in part, dissenting in part. The State adduced overwhelming evidence that the four appellants were guilty of jointly committing a capital murder and two robberies. Their individual defenses were not mutually antagonistic. Although the charges were joined and the appellants were jointly tried, the appellants as well as the State were afforded a just and fair proceeding through the accusatorial phase of the bifurcated capital murder trial.

However, that holding does not mandate the conclusion that the due process protections were sufficiently afforded at the joint sentencing phase of the capital murder trial. The two phases of the bifurcated trial serve vastly different purposes. The essence of the accusatorial phase is the formal adversary presentation of evidence relative to guilt. The adversary concept places the State and the accused on an equal footing and so, in fairness to the State, joint trials are oftentimes required through this stage. Markedly different, the essence of the sentencing phase is the search for relevant information to choose which of the two penalties, life without parole or death, is appropriate for the person already found guilty. This second phase search for information is not based upon the same adversary concept. Our applicable statute provides that mitigating circumstances

may be presented regardless of their admissibility under the rules of evidence while aggravating circumstances may be presented only when they are admissible under the rules of evidence. Ark. Stat. Ann. § 41-1304 (4) (Repl. 1977). The underlying reason for this is that the penalty of death is qualitatively different from all other punishments.

When the death penalty is sought, justice demands individual, not joint, sentencing. It is for this same reason that mandatory death sentences for particular crimes have been declared unconstitutional. *Gregg* v. *Georgia,* 428 U.S. 153 (1976). It is only after a structured exercise of discretion which guarantees individualized sentencing that the death sentence may be imposed. *Proffitt* v. *Florida,* 428 U.S. 242 (1976); *Woodson* v. *North Carolina,* 428 U.S. 280 (1976). Accordingly, after a finding of guilt of capital murder, juries in this State may impose a sentence of death only after considering aggravating and mitigating circumstances. Ark. Stat. Ann. §§ 41-1301 & 1302 (Repl. 1977). Aggravating circumstances are principally related to the personal history of the individual defendant and not the nature of the crime committed. Ark. Stat. Ann. § 41-1303 (Repl. 1977). Mitigating circumstances are totally related to the personal background of the defendant. *Id.* Individualized sentencing requires structured detailed consideration of the personal history of the guilty person before the death sentence may be imposed. Any impediment to that individualized exercise of discretion is violative of the protection of due process.

The clear issue is whether the joint sentencing procedure used in this case afforded each appellant the structured and detailed consideration of his individual background which is required before the sentence of death may be imposed. Surely no one can doubt that when the jury was sent out of the courtroom to fix the punishment for four equally guilty persons at one sitting, that after fixing the penalty for the first three at death, there was a great reluctance to give the fourth a lesser sentence. Such reluctance alone might arbitrarily mandate a fourth death penalty for the particular crime regardless of the guilty person's personal history. This impediment to the in-

dividual exercise of discretion violates due process and the prohibition against arbitrary death sentences.

Such a scenario may well have occurred in the case at bar. In the sentencing phase appellant Clines was shown to have pleaded guilty in 1978 to burglary, a non-violent crime. No other convictions or felonious actions were shown to have been committed by him during this stage of the trial. The only other proof of a prior bad action, for which there was no conviction, came during the accusatorial phase of the trial when an accomplice gave uncorroborated testimony on a collateral matter. Yet, he, too, was given the death sentence.

For this reason I dissent from that part of the well written majority opinion which affirms the joint proceeding to fix the punishments at death. I concur in that part of the opinion affirming the life sentences for the aggravated robberies.

JOHN I. PURTLE, Justice, dissenting. I believe at least one of the appellants, Michael Orndorff, was prejudiced by the trial court's refusal to give him a separate trial. To grant him a separate trial would have in no way selectively excluded him from culpability in regard to the crime for which he was convicted. In fact it seems to me that holding him to trial with the actual murderers practically insured his conviction. Guilt by association is a common human error and in this case I have no doubt it played a big part in the minds of the jury who meted out identical convictions and uniform penalties to all four appellants.

When each of the appellants attempted to place himself outside the bedroom where decedent was shot the result was that each defendant put before the same jury a defense inconsistent with the other defendants' defenses.

The majority opinion seems to infer some type of guilt from some of the appellants' failure to testify. If the trial court did this we would vote unanimously to reverse and remand. The trial court should have granted a severance.

A total of twelve peremptory challenges were allowed the four defendants. One of them did not get to exercise a single peremptory challenge. Had they been tried separately each would have been allowed twelve challenges. Therefore, these appellants were denied rights which are extended to others tried separately on identical charges. There is nothing to prevent a trial judge from allowing more than twelve peremptory challenges if fairness and impartiality demand it.

Furthermore, it was clearly prejudicial to allow evidence of crimes for which the appellants had not been convicted even though this was during the sentencing phase of the bifurcated trial. What happened to the old law that held every individual is presumed innocent? Soon it will be legal for the state to charge an accused of spurious crimes in order to help secure a conviction. For all we know none of the appellants were or will ever be found to have committed the alleged crime which was used during the sentencing phase.

I am still of the opinion that a death qualified jury is not comprised of a cross-section of the population as required by the Constitutions of Arkansas and the United States. It appears to me that there is a misunderstanding of the *Witherspoon* doctrine when prospective jurors are excluded because of religious or moral scruples against the death penalty. Perhaps some member or members of this very court have religious or moral scruples against the death sentence, yet we affirm such sentences if we find no reversible error. One who does not believe in the death sentence may honestly and conscientiously vote for such a sentence in upholding the law. For these reasons I must dissent to the majority opinion.