Michael Ray ORNDORFF, James William Holmes, Hoyt Franklin Clines, Daryl V. Richley, Petitioners,

v.

A.L. LOCKHART, Director, Arkansas Department of Corrections, Respondent.

Nos. PB–C–84–300 to PB–C–84–303.

United States District Court, E.D. Arkansas, Pine Bluff Division.

July 29, 1988.

Ken Breckenridge, Hot Springs, Ark., for Orndorff.

Marshall N. Carlisle, Fayetteville, Ark., for Holmes.

Gerald Coleman, West Memphis, Ark., for Clines.

Charles M. Hulen, Little Rock, Ark., for Richley.

Carter Hardage, Ass't Atty. Gen., St. of Ark., Jack Gillian, Ass't Atty. Gen., State of Ark., Little Rock, Ark., for respondent.

## MEMORANDUM AND ORDER

HENRY WOODS, District Judge.

On the 20th day of April, 1987, a hearing was held on the consolidated petitions for *habeas corpus* filed by the petitioners, Michael Ray Orndorff, James William Holmes, Hoyt Franklin Clines and Daryl V. Richley, pursuant to 28 U.S.C. § 2254. For the reasons stated in this opinion the relief sought is granted in part and denied in part.

## BACKGROUND

The facts giving rise to the instant petitions for *habeas* relief, stated in part in narrative form, are as follows. At approximately 9:45 p.m. on the night of January 8, 1981, the front doorbell rang at Don Lehman's home in Rogers, Arkansas. Lehman opened the door just a few inches to see who was there but was immediately shoved back as four masked men forced their way into his home. At least two of the men were armed with handguns and one was carrying a chain. Following a brief struggle with the intruders Lehman was thrown into his bedroom. He was probably shot once as he was thrown into the room, and was shot twice more while held down on his own bed. He died of the gunshot wounds within minutes. Approximately fifteen to thirty minutes later the four intruders fled the scene, taking with them over $1,200.00 in cash and Don Lehman's collection of guns. Lehman's wife and daughter were present during the entire incident.

Six days later an information was filed by the Benton County, Arkansas prosecuting attorney charging Orndorff, Holmes, Clines and Richley, collectively referred to as the petitioners, with capital felony murder. The information alleged that during or in furtherance of a robbery one or more of the petitioners caused the death of Don Lehman under circumstances manifesting extreme indifference to the value of human life. *See* Ark.Stat.Ann. § 41–1501(1)(a) (Repl.1977) (now codified at Ark.Code Ann. § 5–10–101 (1987)). On May 14, 1981 an amended information was filed which charged the petitioners each, in addition to the felony murder counts, with two counts of aggravated robbery for the alleged use of a deadly weapon with the purpose of committing a theft from Lehman's wife and daughter. *See* Ark.Stat.Ann. § 41–2102 (Repl.1977) (now codified at Ark. Code Ann. § 5–12–103 (1987)).

The petitioners were tried jointly, despite numerous motions for severance, and the jury returned verdicts of guilty on all counts. On September 28, 1981 the trial judge sentenced each of the petitioners to consecutive life terms on the aggravated robbery counts and, following the unanimous recommendation of the jurors, sentenced each of them to death by electrocution on the felony murder counts. The convictions were affirmed on appeal to the Arkansas Supreme Court and petitions for collateral relief pursuant to Arkansas Rule of Criminal Procedure 37 were summarily denied. *See Clines v. State*, 280 Ark. 77,

656 S.W.2d 684 (1983), *cert. denied*, 465 U.S. 1051, 104 S.Ct. 1328, 79 L.Ed.2d 723 (1983).

On June 28, 1984 appointed counsel filed in this court separate petitions for *habeas corpus* relief on behalf of each petitioner. These petitions were consolidated for disposition by order of October 23, 1984. Between June, 1985, and August, 1986, the case was closed for administrative purposes as there was a case before the United States Supreme Court which, if decided in the petitioners' favor, would have mandated that *habeas* relief be granted. It was not so decided and a hearing was scheduled for April, 1987, on the remaining issues raised in the consolidated petitions. *See Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), *reversing sub nom., Grigsby v. Mabry*, 758 F.2d 226 (8th Cir.1985) (*en banc*) (in which the Eighth Circuit held the "death qualified Jury" unconstitutional). At the *habeas* hearing the court ordered that post-hearing briefs be filed and agreed to let counsel for each of the petitioners divide the issues raised so that they did not duplicate each other's efforts, and so they could each devote more time to the research of each issue. Following a delay of over one year, occasioned by numerous requests for extensions of time in which to file the briefs and the necessity of appointing substitute counsel for one of the petitioners after the briefs had been filed, the case is now ready for disposition.

In their consolidated petition and common briefs the petitioners allege as grounds for relief: (1) that the Arkansas Capital Felony Murder Statute is unconstitutional; (2) that the trial court's denial of motions for severance violates their Fourteenth Amendment right of due process; (3) that the use of a "death qualified jury" violates the fair cross section requirement of the Sixth Amendment; (4) that the jury was improperly "death qualified" under *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); (5) that the trial court's decision limiting them to a total of twelve peremptory challenges violates their Fourteenth Amendment right to equal protection of the law; (6) that non disclosure of the fact that two state witnesses had been subjected to hypnosis at the prosecutor's direction violates their Sixth and Fourteenth Amendment rights; (7) that allowing the jury to consider the motive of "pecuniary gain" as an aggravating circumstance in the sentencing phase of the trial violates their Eighth Amendment rights; and (8) that petitioner Clines was denied his Sixth Amendment right to effective assistance of counsel. The respondent concedes that all state remedies have been exhausted. Each issue will be addressed below, not necessarily in the order raised.

## I. HYPNOSIS

The murder victim's wife, Virginia Lehman, and their daughter, Vicki Lehman, were at home on January 8, 1981 and were witness to the tragic events which took place that evening. On January 9 and January 14, 1981 both Virginia and Vicki were interviewed by the police and their statements were recorded. Vicki was able to give the police a description of the four masked men and she helped a police artist sketch the one who had removed his mask during the commission of the crime. She later identified petitioner Clines in a police line up as that man. The prosecutor testified at the *habeas* hearing, however, that on February 10, 1981 he had made the decision to have the Lehman women hypnotized. The reason articulated for this decision was that Virginia's descriptions were vague and that Vicki was unable to recall the name one of the intruders had called the other.

Carrying out his decision to hypnotize Virginia and Vicki the prosecutor enlisted the aid of one Gene Peters, who had learned how to hypnotize people in a six month course at the Springfield School of Hypnosis in Springfield, Missouri. That school has no official degree program, offers no diploma and has a faculty of one— the owner. Following his "graduation" Peters made his living for a time by helping people to lose weight and stop smoking with the aid of hypnosis. He also worked with a couple of patients of a local dentist and hypnotized witnesses to a string of gas

station hold-ups for the Rogers police department. Peters has never testified as an expert witness but was called to the stand once in a criminal trial when a former client of his asserted as a defense that he committed a bank robbery under the influence of a post-hypnotic suggestion. Peters has no degree from any accredited college or university.

At the prosecutor's suggestion Virginia and Vicki Lehman went to Peters' office to be hypnotized on February 18, 1981. Peters asked that the prosecutor not show him the Lehmans' prior statements because he did not want to be in a position to ask questions which suggested the answer. Peters had, however, previously seen newspaper accounts of the crime and he conducted more than one session with the Lehmans at which their stories were recited. In his deposition, which was introduced in evidence at the *habeas* hearing, Peters testified that he did not think Virginia was a good subject for hypnosis but that he would stand corrected if someone told him otherwise. He recalled that Vicki, on the other hand, was quite good and that he had four or five sessions with her. He only twice tried to hypnotize Virginia, and she testified at the hearing that she thought he had only two sessions with Vicki.

Virginia was permitted to attend Vicki's sessions with Peters, and Vicki was present at Virginia's. But other than Peters no others were present. During the sessions Peters would try to get his subjects to revisualize and relive the events of January 8 and, following each session, he and the Lehmans would report to the prosecutor's office. Peters took notes of each session but no electronic recording devices were used. His notes were never turned over to the prosecutor and have since been destroyed. Neither Peters or the prosecutor have any record of the questions asked and the responses given.

At the *habeas* hearing the prosecutor testified that he did not inform defense counsel that the Lehmans had been hypnotized because no new information had been elicited and he did not consider the fact that hypnosis had been performed to be exculpatory evidence. In fact, counsel for the petitioners were not aware that hypnosis had been performed until after the appeal was filed with the Arkansas Supreme Court. The petitioners argue now that this failure to disclose the fact of hypnosis violates their Sixth Amendment right of confrontation and their Fourteenth Amendment right of due process. The state responds that the non disclosure was harmless error beyond a reasonable doubt.

## A. The Sixth Amendment Claim

■ The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with witnesses against him." The purpose of this right to confrontation is to secure for the defendant the opportunity for cross-examination, and the right is applicable to state as well as federal proceedings. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 1109, 39 L.Ed.2d 347 (1974); *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). A defendant shows a violation of the Sixth Amendment right to confrontation if he proves that he was prevented from exposing facts to the jury from which they could reasonably make inferences about the reliability of the witness. *Delaware v. Van Arsdall*, 475 U.S. 673, 680, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1985); *Davis v. Alaska, supra* 415 U.S. at 318, 94 S.Ct. at 1111; *United States v. Gregory*, 808 F.2d 679, 680–81 (8th Cir.1987); *United States v. Dempewolf*, 817 F.2d 1318 (8th Cir.), *cert. denied,* —— U.S. ——, 108 S.Ct. 245, 98 L.Ed.2d 203 (1987). But an otherwise valid conviction should not be set aside if the reviewing court is able to confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall, supra* 475 U.S. at 684, 106 S.Ct. at 1438; *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). In this case the court finds that there was constitutional error committed and that the error was not harmless beyond a reasonable doubt.

There have been a plethora of recent federal and state court decisions concern-

ing the effects of hypnotically enhanced testimony, most of which are noted in the Supreme Court's recent decision on the subject. *See Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987). Although *Rock* decided the converse of the issue presented here—the right of a previously hypnotized criminal defendant to testify on his own behalf—that opinion is, nonetheless, instructive. In *Rock*, the Supreme Court granted certiorari to review a Supreme Court of Arkansas ruling which limited the testimony of a criminal defendant who had been hypnotized to "matters remembered and stated to the examiner prior to being placed under hypnosis." The basis for the Arkansas court's decision was that hypnotically refreshed testimony of a witness is inadmissible *per se* because the dangers of admitting such testimony always outweigh whatever probative value it may have. The Supreme Court vacated and remanded, reasoning instead that the *per se* exclusionary rule impermissibly infringed on a criminal defendant's right to testify on his own behalf, in part because the Arkansas rule left the trial court with no discretion to admit such testimony even if it was determined to be reliable.

Discussing the reliability of hypnotically refreshed testimony the Court stated that the most common response to hypnosis appears to be an increase in both correct and incorrect recollections. *Id.* at 107 S.Ct. 2713. In the Court's words this occurs because

> [t]he subject becomes "suggestible" and may try to please the hypnotist with answers the subject thinks will be met with approval; the subject is likely to "confabulate," that is, to fill in details from the imagination in order to make answers more coherent and complete; and, the subject experiences "memory hardening," which gives him great confidence in both true and false memories, making effective cross-examination more difficult.

The Court went on to say that

> [t]he inaccuracies the process introduces can be reduced, although perhaps not eliminated, by the use of procedural safeguards. One set of suggested guidelines calls for hypnosis to be performed only by a psychologist or psychiatrist with special training in its use and who is independent of the investigation. These procedures reduce the possibility that biases will be communicated to the hypersuggestive subject by the hypnotist. Suggestion will be less likely also if the hypnosis is conducted in a neutral setting with no one present but the hypnotist and the subject. Tape or video recording of all interrogations, before, during, and after hypnosis, can help reveal if leading questions were asked ... Cross-examination, even in the face of a confident defendant, is an effective tool for revealing inconsistencies. Moreover, a jury can be educated to the risks of hypnosis through expert testimony and cautionary instructions. (citations omitted).

107 S.Ct. at 2713–14. Similar procedural safeguards have also been suggested by the Eighth Circuit Court of Appeals. *See Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir.), *cert. denied*, 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986).

 In the instant case it is undisputed that Vicki Lehman, one of only two occurrence witnesses, had been hypnotized prior to the time she participated in a reenactment of the crime and before she testified at trial. It is further undisputed that the trial court never had an opportunity to rule on the admissibility or reliability of her hypnotically refreshed testimony, because the fact that she had been hypnotized was never disclosed by the prosecution. Furthermore, it is apparent that virtually no procedural safeguards were followed. The hypnotist had no college degree in psychology or any other subject. He had read of the events in question in the local newspaper and had conducted his sessions without charge in the hope of uncovering a new lead which he could later "brag on." Virginia Lehman, the only other occurrence witness, was present each time Vicki underwent hypnosis and the sessions were not electronically recorded. The only notes of the sessions have been destroyed and had been, prior to their destruction, in the sole

possession of the hypnotist thereby making it virtually impossible to determine whether subtle or overt suggestions were introduced.

This haphazard manner in which the sessions were conducted leaves no doubt that the state's failure to disclose the fact that hypnosis was performed on one of its two occurrence witnesses prevented the petitioners from exposing facts to the jury from which they could make inferences about the reliability of the witness's testimony—a violation of the confrontation clause of the Sixth Amendment. And the prosecutor's own arguments at trial, in which he emphasized the clarity of Vicki Lehman's memory and the importance of her testimony, prevents the court from concluding that the error was harmless beyond a reasonable doubt. An example is illustrative.

The prosecutor began his opening statement by stating that the jury was going to be "amazed at the recollections" of Vicki Lehman. Then, in closing, he stated that

[i]n spite of being faced with the traumatic ordeal as it happened, [Vicki] did not lose her presence of mind. She did not lose her sense of observation or objectivity. It was stored there. It took a little while to get it out of her, we had to talk to her several times. We had to go back and re-enact that scene finally and jerk her hair around, just like it was. Just like it happened to her to get her to remember if a gun was pointed here, who was here and who was there. It was stored in there and she was later able to recall it. And she recalled it well on the stand. I suggest to you that she saw and heard exactly what she testified to could not be doubted. Her physical description of these four people, just incredible. (Tr. 4269).

. . . . .

This girl has powers of observation that were working and working right then and never quit working. There were times when things were confusing, but I suggest to you that her testimony was unimpeachable. They tried to attack it and they got nowhere. (Tr. 4269–70).

. . . . .

Her testimony is real important. Important for several reasons, two in particular. One, because it just describes the hideous crime, the hideous, unprovoked attack on—breaking in the door and attacking her father. But two, her testimony showed unequivocally, that all four of these defendants—each and every one of them—were involved directly in the attack that resulted in her father's death. (Tr. 4270).

Had the fact of hypnotism been disclosed to defense counsel and the trial court this court may well have decided this issue differently. Federal courts are in agreement that a witness' hypnotically enhanced testimony does not violate the confrontation clause, in and of itself, where both the witness and the hypnotist are available for cross-examination concerning the effects of the procedure. *See, e.g. Clay v. Vose*, 771 F.2d 1 (1st Cir.1985), *cert. denied*, 475 U.S. 1022, 106 S.Ct. 1212, 89 L.Ed.2d 324 (1986); *Chaussard v. Fulcomer*, 816 F.2d 925 (3rd Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 139, 98 L.Ed.2d 96 (1988); *McQueen v. Garrison*, 814 F.2d 951 (4th Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 332, 98 L.Ed.2d 359 (1987); *Harker v. State of Maryland*, 800 F.2d 437 (4th Cir.1986); *Beck v. Norris*, 801 F.2d 242 (6th Cir.1986); *United States v. Charles*, 561 F.Supp. 694 (S.D.Tex.1983). And the Eighth Circuit has adopted a flexible rule for the admissibility of hypnotically refreshed testimony whereby the district court may allow it after conducting a pretrial hearing to assess the effect of hypnosis upon the reliability of the testimony. The proponent of such evidence bears the burden of proof and, if such evidence is admitted, the opposing party may cross-examine concerning hypnosis and both parties may bring in experts to testify to the problems and benefits of hypnosis. *Sprynczynatyk v. General Motors Corp.*, *supra* at 1122–24; *Little v. Armontrout*, 835 F.2d 1240 (8th Cir.1987) (failure to provide indigent defendant with

hypnotic expert violated defendant's right to fair trial).

The procedures followed in this case, however, compounded by the prosecutor's failure to disclose, denied the trial court an opportunity to assess the reliability of the testimony, denied the petitioners the right to full and effective cross-examination and denied the jury the opportunity to assess the credibility of a key state witness from a proper perspective. All of the instances where Ms. Lehman's trial testimony differed from or added to her previous statements need not be discussed because the court finds that the prosecutor's failure to disclose was inherently prejudicial. As stated by one court,

> [o]nce a witness makes a recitation under hypnosis, his confidence in that supposed memory—whether genuine or invented—is greatly strengthened (sic). The witness then may have an unshakeable subjective conviction that gives his account on the witness stand the imprimatur of absolute confidence. (citations omitted).

*United States v. Valdez,* 722 F.2d 1196, 1202 (5th Cir.1984). The petitioners have the right to bring this, and other problems associated with hypnotically refreshed memory before the jury on cross-examination.

The prosecutor knew, or should have known, that his failure to disclose may constitute reversible error. At the *habeas* hearing he testified that he did some legal research regarding hypnosis in which he located the case of *United States v. Adams,* 581 F.2d 193 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed. 2d 683 (1978). That case expressly states that reversals have been predicated on the failure to disclose the fact of hypnosis. *Id.* at 198. Yet, the prosecutor chose not to reveal that two witnesses had been hypnotized and, in part because of that decision, this court finds that the petitioners' Sixth Amandment right to confront witnesses against them has been denied.

**B. The Fourteenth Amendment Claim**

■ The petitioners argue that their right to due process under the Fourteenth Amendment was denied because the prosecutor failed to inform defense counsel that a state witness, Vicki Lehman, had been hypnotized. The court agrees. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), holds that the suppression of evidence favorable to an accused upon request violates due process where the evidence is favorable either to guilt or punishment. And evidence which may be used to impeach a witness's credibility has been held to come within the *Brady* rule. *Giglio v. United States,* 405 U.S. 150, 154–55, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972). Constitutional error occurs, however, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 678, 105 S.Ct. 3375, 3381, 87 L.Ed.2d 481 (1985). The court concludes in this case that there was constitutional error.

■ Arkansas Rule of Criminal Procedure 17.1 requires the prosecutor to disclose to defense counsel upon timely request

> any reports or statements of experts, made in connection with the particular case, including results of physcal or mental examinations, scientific tests, experiments or comparisons.

Additionally, a pretrial order was issued by the trial court which required the prosecutor to disclose, *inter alia,* the "results of scientific tests when available." The court has no doubt that hypnosis falls within the broad category of "scientific tests." Therefore, construing the pretrial order as conclusive evidence of a timely request, the court finds that disclosure was required under *Brady.*

Although numerous witnesses testified as to events which occurred prior to or after the robbery and murder, only Vicki and Virginia Lehman were witness to what took place inside their home. Moreover, since Virginia Lehman was instructed by the intruders to remain on the floor in a face down position Vicki's testimony became most important. She described in detail the way the four masked men broke through the door and the positions each of

them took up inside the home. She retraced their movements and it was her testimony alone that placed all four intruders in the bedroom where the murder took place—a deviation from her pretrial statement in which she could place only three men in that room when the shots were fired.

In contrast to Vicki's vivid testimony, Virginia Lehman's testimony was brief and was lacking in detail as to the events which unfolded. She remembers hearing the commotion when the intruders broke in and then she remembers hearing a shot, but cannot be sure where the people were when she heard it. Her testimony only places three of the intruders in the room and she remembers only one gun and one gunshot. This lack of detail in Virginia's testimony and the gaps in her memory highlight the importance of Vicki's testimony to the jury.

The court's review of the entire record does reveal, beyond a reasonable doubt, that the petitioners were responsible for the robbery homicide for which they were tried. Their activities in preparation for the armed break-in and the events which later lead to their apprehension were fully documented through the testimony of thirty four prosecution witnesses. However, even though there is no question of their guilt for the crimes charged, the court is unable to say with confidence that the jury would have recommended the death penalty for each and every petitioner had defense counsel been informed of Vicki Lehman's hypnosis. Critical portions of her testimony may have been disregarded by the jury had they known of the effects of hypnosis, or the trial court may have deemed some testimony inadmissible altogether. *Cf. Little v. Armontrout, supra* (trial court's refusal to appoint an expert in hypnosis for an indigent defendant violated due process and rendered the trial fundamentally fair).

Therefore, it is the finding and decision of this court that the petitioners' Sixth and Fourteenth Amendments rights were violated, and that, unless the state either retries the petitioners or commutes their death sentences to life without parole within 120 days, the writ shall issue. For appeal purposes the court will now address the remaining issues raised by the petitioners.

## II. ARKANSAS' FELONY MURDER STATUTE

The petitioners assert that the Arkansas Felony Murder Statute is unconstitutional because (a) it does not require the jury to consider the culpability of each defendant, (b) it provides for a mandatory death penalty, and (c) it is vague and overbroad. Each of these issues was fully addressed and rejected by the Arkansas Supreme Court in a well written opinion with which this court concurs. *See Clines v. State, supra.* Accordingly, without further discussion, this claim for relief is denied.

## III. SEPARATE TRIALS

■ The petitioners take the position that the trial court's denial of their motions for separate trials was an abuse of discretion which resulted in a "smear effect" among them and the exclusion of certain out of court statements alleged to be exculpatory to individual petitioners. Inasmuch as this argument turns on alleged violations of Arkansas procedural rules it does not state a claim for *habeas* relief. Rather, the petitioners must show that the trial court's failure to grant their motions for severance rendered the joint proceeding fundamentally unfair so as to violate due process. *Johnson v. Dugger,* 817 F.2d 726 (11th Cir.1987); *Manning v. Warden, Louisiana State Penitentiary,* 786 F.2d 710 (5th Cir.1986); Cf. *Robinson v. Wyrick,* 735 F.2d 1091 (8th Cir.), *cert. denied,* 469 U.S. 983, 105 S.Ct. 390, 83 L.Ed.2d 324 (1984) (to obtain federal *habeas* relief for failure to sever offenses, the joinder must render the trial fundamentally unfair). Upon review of the record the court finds that the petitioners have failed to meet their burden of proof.

At *voir dire* each of the jurors stated under oath that he or she could consider each defendant separately and they were instructed at the close of trial that they

must so consider each defendant, rendering separate verdicts as if each had been tried separately. The record shows more than ample evidence from which the jury could have found, beyond a reasonable doubt, that each petitioner was guilty of the crimes charged. There is simply no indication of a "smear" effect and, in the face of evidence showing unequivocally that the petitioners jointly planned and executed an armed robbery during which a homocide was committed the court cannot say that the petitioners were prejudiced by evidentiary rulings so as to make their trial fundamentally unfair. Accordingly, this claim for *habeas* relief is denied.

## IV. JURY SELECTION UNDER WITHERSPOON

■ *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), holds that a state may not carry out a sentence of death imposed by a jury which was selected by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed religious or conscientious scruples against its infliction. *Id.* at 521–22, 88 S.Ct. at 1776–77. The most that can be demanded of a prospective juror is that he or she be willing to *consider* all of the penalties provided by state law, and that he or she not be irrevocably committed before the trial has begun to vote against the death penalty regardless of the facts and circumstances that might emerge. *Id.* at 522, n. 21, 88 S.Ct. at 1777 n. 21. The petitioners contend here that the *Witherspoon* rule was violated with respect to three veniremen. The court disagrees.

The petitioners argue that Betty Kaiser was excused for cause because she stated that she didn't "think" she would impose the death penalty, and that Karen Dick was excused for cause because of her statement that she "might could" vote for the death penalty. They also state that their request to have Harley Woods excused was refused even though he said he could not vote for anything other than the death penalty on the first ballot, and that they had to exercise a peremptory strike against him which would have been used later.

■ In ruling on these claims on appeal the Arkansas Supreme Court held that, in context, the statements relied on were tentative or equivocal. The court went on to rule that the trial court was in the best position to gauge the attitude of the veniremen and that the trial court's discretion was not wrongly used. *Clines v. State*, 280 Ark. at 89–90, 656 S.W.2d at 688–89. These rulings of the trial court and the state supreme court are entitled to a presumption of correctness under 28 U.S.C. § 2254(d). *Wainright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The petitioners have not overcome the presumption.

In addition to the excerpts of the *voir dire* relied on by the petitioners, Kaiser stated that she could not impose the death penalty herself, and that that feeling was fairly firmly fixed. When asked by the prosecutor if she could consider alternatively life without parole or death she answered that she could not. And she stated without equivocation that even though she believes some people deserve the death penalty she would not vote for it.

Dick was excused for cause both because she had preconceived notions of guilt and because of her inability to consider the death penalty. She stated that at the time she received information from the media and third parties she had formed an opinion as to guilt or innocence. And she placed herself in a category of persons who, while not opposed to the death penalty, could not personally impose it. In addition, she stated that if the evidence presented a close question as to guilt or innocence she would feel some pressure to vote for guilt because of the expectations of third parties.

Woods, whom the trial court refused to excuse for cause, stated that facts and circumstances may dictate a sentence of life without parole as opposed to the death penalty. He assured the court that he could keep an open mind on punishment until he had heard all of the evidence in the sentencing phase of the trial. In response to defense counsel's question whether he thought the only permissible punishment

for one convicted of capital murder was death he replied that it would have to be considered after weighing the evidence. Moreover, in response to a question by the court Woods stated that he could consider either life without parole or death and base his decision on the evidence.

Accordingly, the court finds that the trial court's rulings are supported by the record, that the *Witherspoon* rule was not violated and that this claim for *habeas* relief must be denied.

## V. PEREMPTORY CHALLENGES

■ The trial court limited the petitioners to a total of twelve peremptory challenges pursuant to Ark.Stat.Ann. § 43–1929 (Repl.1977) (now codified at Ark. Code Ann. § 16–33–307 (1987)), which provides that when several defendants are tried jointly a challenge by one shall be the challenge by all. The petitioners argue that, had they been tried separately, each would have been entitled to twelve peremptory challenges, and that because they were limited to a total of twelve in the joint proceeding they have been denied equal protection of the laws under the Fourteenth Amendment. This argument is without merit.

■ First, there is no constitutional right to peremptory challenge. *Stilson v. United States*, 250 U.S. 583, 40 S.Ct. 28, 63 L.Ed. 1154 (1919). All that is guaranteed by the constitution is the right to an impartial jury. *Id.;* U.S. Const.Amend. VI. This the petitioners received. Second, since it is not argued that persons tried jointly comprise a suspect class, and there is not at issue a fundamental right guaranteed by the constitution, this court must analyze the petitioners' claim under the rational basis standard of review. *Harris v. McRae*, 448 U.S. 297, 322, 100 S.Ct. 2671, 2691, 65 L.Ed.2d 784 (1980) (quoting *McGowan v. Maryland*, 366 U.S. 420 at 425, 81 S.Ct. 1101 at 1104, 6 L.Ed.2d 393 (1961)). Under that standard the petitioners' claim fails because the state's legitimate interest in expediting trials, thereby conserving judicial resources, is rationally related to the procedural rule enacted. For the same reason, the petitioners' argument that the state rule is arbitrary and irrational in violation of the due process clause of the Fourteenth Amendment must also fail. *See, e.g. Tarter v. James*, 667 F.2d 964 (11th Cir.1982) (statute allocating peremptory challenges on basis of county population rationally related to state's purpose). This claim for relief is, therefore, denied.

## VI. INEFFECTIVE ASSISTANCE OF COUNSEL

Petitioner Clines alleges that his counsel at trial was ineffective because (a) on cross-examination of a state witness he elicited testimony that Clines had been involved in another crime the night before the Lehman incident, (b) he failed to timely object to introduction of a co-defendant's out of court statement which implicated Clines as the one who beat and/or killed Don Lehman, and (c) he failed to object to the introduction of Clines' tennis shoe into evidence. Analyzing these claims under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the court finds that Clines was not denied his Sixth Amendment right to effective assistance of counsel and that this claim for relief must be denied.

To prevail on a claim of ineffective assistance of counsel the petitioner must establish that counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result. *Id.* at 686, 104 S.Ct. at 2063. In order to do so he must show first that the defense was prejudiced. To be prejudicial the errors of the petitioner's counsel must give rise to a reasonable probability that, in the absence of error, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068. And to be deficient the counsel's performance must fall below an objective standard of reasonableness when all circumstances are considered. *Id.* at 687–88, 104 S.Ct. at 2064–65. The petitioner must overcome the presumption that the challenged action might be considered sound trial strategy, and the reasonableness of counsel's actions may be determined or

substantially influenced by the petitioner's own statements or actions. *Id.* at 691, 104 S.Ct. at 2066.

■ As to Clines' first claim, that counsel elicited damaging testimony from a state witness, the court need not reach the prejudice component of the *Strickland* test because counsel's strategy was not unreasonable. In his deposition, Clines' trial counsel stated that he had asked Clines about his involvement in prior crimes with the other three defendants. He said that Clines "categorically denied any involvement at all" and that "he made excuses, alibis, swore to us that he was not involved in anything" the state witness was testifying to. The alleged damaging questions were asked because counsel was "relying on what Clines had told [him]" and, on that basis, he made a "judgment call." The court finds counsel's actions to be objectively reasonable.

■ Clines admits in his brief that the prejudice resulting from the other two alleged errors was "very small" or "may or may not have been strong." The court agrees with this assessment. The admission of Clines' tennis shoe into evidence had virtually no bearing on the outcome of the trial as there was overwhelming evidence which placed Clines at the scene of the crime. The out of court statement of petitioner Richley, that Clines was the one who removed his mask and beat Lehman with a chain, was likewise not prejudicial because Vicki Lehman had previously identified Clines as that man. She helped a police artist sketch Clines and she later identified him in a line-up. Moreover, state witness Tammy Baker established that Clines had possession of a chain shortly before he went to the Lehman home, and the state medical examiner testified that Lehman had been struck with a link type instrument.

## VII. THE DEATH QUALIFIED JURY

In *Lockhart v. McCree*, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), the Supreme Court ruled that death qualification—the removal of jurors whose opposition to the death penalty is so strong that it would prevent or substantially impair the performance of their duties as jurors—does not violate the "fair cross section" or "impartiality" guarantees of the Sixth Amendment. This case fully disposes of the petitioners' argument that death qualification is unconstitutional and that claim for relief is, accordingly, denied.

## VIII. PECUNIARY GAIN AS AN ELEMENT OF THE UNDERLYING OFFENSE AND AS AN "AGGRAVATING CIRCUMSTANCE" TO JUSTIFY A PENALTY OF DEATH

In *Lowenfield v. Phelps*, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), the Supreme Court fully explored the "double counting" issue and held that there is no Eighth Amendment violation where an "aggravating circumstance" used to justify the death penalty duplicates an element of the underlying offense. This case is dispositive of the issue as raised by the petitioners and, accordingly, this claim for relief is denied.

## IX. VOLUNTARY WITHDRAWAL OF ISSUES RAISED

■ At the *habeas* hearing both petitioners Clines and Orndorff testified, against advice of counsel, that they would like to withdraw any issues which, if decided in their favor, could result at best in the reduction of their sentences to life without parole. And more recently, petitioner Richley has filed a *pro se* motion to dismiss his petition in its entirety. Counsel for each of the three have asked the court to order psychiatric examinations before ruling on the merits of the petitioners' requests—which if granted would result in the petitioners' executions. For the reasons that follow the court deems it unnecessary to order the examinations or to rule on the requests to withdraw the petitions.

The state trial was a joint proceeding involving all four of the petitioners as co-defendants. And the court has ruled, above, that the trial was constitutionally defective. Because petitioner Holmes has not asked to withdraw his petition the court finds that all issues heretofore addressed

in this opinion, with the exception of Clines' claim of ineffective assistance, were properly before it. Because of the role this court plays in the administration of justice it cannot permit the state to execute three of four co-defendants sentenced to death following an unconstitutional proceeding. It is not the court's concern whether Clines, Orndorff and Richley wish to die at the hand of the state. Rather, it is the court's concern that if the state chooses to execute one convicted of a crime, it do so in a manner that comports with the Constitution of the United States. This the state has not done.

The petitioners' reliance on *Gilmore v. Utah*, 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed. 2d 632 (1976) is misplaced. In that case the Supreme Court held only that it had no jurisdiction to hear an appeal of Gilmore's death sentence brought by a next friend where there had been no showing that Gilmore was unable to seek relief on his own behalf. In the instant case the court does have jurisdiction by virtue of Holmes' petition for *habeas* relief. Because Clines, Orndorff and Richley were Holmes' co-defendants in a joint trial, a finding by this court that the joint trial was conducted in an unconstitutional manner must inure to their benefit whether they sought to gain such relief or not.

## X. CONCLUSION

For the foregoing reasons IT IS HEREBY ORDERED that the writ shall issue in 120 days unless the petitioners are given a new trial or, in the alternative, their sentences of death commuted to life without parole.