Joseph Harold WENZEL *v.* STATE of Arkansas

CR 91-76                                                815 S.W.2d 938

Supreme Court of Arkansas
Opinion delivered September 30, 1991

*Davis and Associates, P.A.*, by: *Charles E. Davis*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Clint Miller*, Senior Asst. Att'y Gen., for appellee.

JACK HOLT, JR., Chief Justice. The appellant, Joseph Harold Wenzel, was charged with breaking into two homes and raping the occupants. He was tried by a jury, convicted of two counts of burglary and two counts of rape, and sentenced to a total of sixty years imprisonment.

On appeal, Wenzel claims the trial court erred in allowing the admission of FBI DNA profile test results because 1) the DNA laboratory proficiency test results were not timely dis-

closed, and 2) the DNA profile test results were obtained from vaginal swab samples which were depleted during testing. There is no merit to either of Wenzel's arguments, and we affirm.

Wenzel first argues that the DNA profile test results should not have been admitted into evidence since the State's failure to timely provide the proficiency test results, with regard to the profiles, deprived him of due process and his right to pretrial discovery.

The FBI DNA profile results were obtained by comparing Wenzel's blood samples with vaginal swab samples containing semen, taken from both victims. Agent Lawrence Presley, who conducted the analyses, testified that both tests revealed a "match" between the DNA profile of Wenzel's blood and the semen obtained from the vaginal swabs. Although the record is unclear as to its definition, proficiency testing apparently is an internal procedure, conducted by the FBI on occasion, to determine whether its laboratory technicians are performing the analyses correctly.

In preparation for trial, Wenzel's counsel filed a motion for discovery of all scientific tests. Later, Wenzel filed an amended motion for discovery in which he requested a number of documents pertaining to the DNA tests. Wenzel received all the items requested, including autoradiographs, laboratory notes and the profile results, except for the proficiency test results.

The trial court conducted what it termed a "*Frye*" hearing[1] on July 11, 1990, to determine whether the DNA profile tests constituted admissible evidence and to consider Wenzel's discovery motions, particularly with regard to discovery of the proficiency tests. Agent Presley testified that it was the policy of the FBI not to release the proficiency tests. The hearing was contin-

---

[1] The term "*Frye*" hearing stems from the seminal case of *Frye* v. *United States*, 293 F. 1013 (D.C. Cir. 1923), which first promulgated a standard for determining the admissibility of novel scientific evidence. Although it labeled the hearing as such, the trial court noted that this court has not yet decided whether to adopt the *Frye* standard of admissibility (*see Rock* v. *State*, 288 Ark. 566, 708 S.W.2d 78 (1986)), and thus considered the matter in light of both *Frye* and the Arkansas Rules of Evidence. Again, we need not determine which standard is appropriate since the issue of reliability and admissibility of the DNA tests, themselves, is not before us.

ued on August 30, on which date Wenzel filed a motion *in limine* requesting that the DNA profiling results be excluded since he had been denied access to the proficiency tests. The trial court ruled that the profile tests were generally admissible but reserved ruling on the motion *in limine* until the day of trial, which was to begin on September 4. The court, apparently concerned as to whether it had jurisdiction to order the FBI's release of the proficiency tests, instructed the State to determine why the FBI maintained a policy against releasing the proficiency "grades," and cautioned that Agent Presley should bring the records to trial and be ready to release them if so ordered.

On the second day of trial, just prior to the State's direct examination of Agent Presley, the trial court took up the matter of Wenzel's motion *in limine*. The following dialogue took place:

THE COURT: The next one is that the defendant has been denied access to the proficiency tests. We had a hearing — I don't remember what day it was — when the FBI man was down here, Mr. Presley. It was about a month ago, maybe?

MR. ZISER: The first part of July, Your Honor.

THE COURT: And then on August 30th this Motion in Limine. Now, I've told you both on the record, I believe, that I was going to delay my ruling until I was able to have some information from the prosecutor. Are you willing to give — I know he said it was their policy not to give out proficiency tests. Now, are you not wanting to give them out?

MR. ZISER: Your Honor, Agent Presley arrived today and he brought the proficiency test results with him. He told me that as far as he was concerned, just to release them. So the State is in position to release them to the defendant in this case if they still want them. I've got them right here on my desk. I would like to have a copy made so that I have one as well as the defense does, but I certainly have no objection to them seeing them.

THE COURT: Mr. Davis?

MR. DAVIS: Your Honor, I'm most grateful to the

State, but it's a little bit late in the hour to further proceed or call this witness until I have an opportunity to see those, Your Honor. Apparently, they were here not only today but yesterday.

MR. ZISER: No, sir, I got them over the lunch hour today.

THE COURT: Well, your original discovery motion has requested those, but it wasn't brought to my attention that you were still — you know, wanted a motion to compel. A month ago you asked this fellow on the stand, or the first part of July, and he said, Well, by golly, our policy is we don't give them up. Now on August 30th is when you filed your Motion in Limine asking me to do something about it, and I'm trying to do it. I've told them we're going to wait until this fellow comes down here and see what he's got. Now, he's got these proficiency tests and what I'm going to do is let you make copies of them, Mr. Ziser, or give him the originals one, so Mr. Davis can look at them before he has to cross examine the witness. *Over your objection, Mr. Davis*, I'm going to allow him to call the witness to get his testimony started this evening, and I'm going to quit about five o'clock and he can finish up his testimony in the morning. That will give you this evening to go through these proficiency tests to see if there's any bad test results in there or what's in there. I don't know. But that's how we're going to work it. Your objection to my ruling will be noted.

MR. DAVIS: Thank you, Your Honor.

THE COURT: Anything else on your motion? I think that finally got all your motion covered, didn't it?

MR. DAVIS: Yes, Your Honor.

(Emphasis added.)

■ Wenzel's argument on appeal, that because he was not furnished the proficiency tests in a timely manner, he was denied due process and his right to pretrial discovery under A.R.Cr.P. Rule 17.1, was not raised below. Wenzel argued, in his motion *in limine* and at the pretrial hearing, that denial of *access* to the

proficiency tests violated the due process clause and the sixth amendment. Then, at trial, Wenzel's objection appears to have been premised on the fact that the court was going to permit Agent Presley to testify before Wenzel had an opportunity to examine the proficiency tests, to which the court responded, "Over your objection, Mr. Davis, I am going to allow them to call the witness, and he can finish up his testimony in the morning. That will give you this evening to go through these tests." Wenzel never objected, however, to untimely discovery and lack of time to examine the evidence, either when the court announced its decision to defer a ruling until the day of trial, or during the trial itself. More importantly, Wenzel did not ask for an additional continuance following his overnight examination of the records. *See Renton* v. *State*, 274 Ark. 87, 622 S.W.2d 171 (1981); *Hughes* v. *State*, 264 Ark. 723, 574 S.W.2d 888 (1978). Only specific objections made at trial are preserved for appeal. *Prince* v. *State*, 304 Ark. 692, 805 S.W.2d 46 (1991).

Furthermore, by failing to object on the basis of untimely discovery, both when the trial court deferred its ruling at the pretrial hearing and when it granted an overnight continuance, Wenzel, in effect, agreed with the trial court's ruling by which the profile results would be admitted and cannot now attack that ruling on appeal. *See Matthews* v. *State*, 305 Ark. 207, 807 S.W.2d 29 (1991).

Wenzel also objects to the admission of the DNA profile test results on the basis that FBI technicians used up all of the semen found on the vaginal swabs, during the DNA testing. This objection was properly preserved in Wenzel's motion *in limine* and at the pretrial hearing.

Wenzel concedes that the State did not technically *withhold* the samples, but argues that its failure to preserve enough evidence so that the defense could conduct its own tests, deprived him of a fair trial. The United States Supreme Court addressed the issue in *California* v. *Trombetta*, 476 U.S. 479, 488 (1984), stating: "[w]hatever duty the Constitution imposes on the State to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense." The court opined that "evidence must both possess an exculpatory value that was *apparent before the*

*evidence was destroyed*, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Id*. at 489. (Emphasis ours.) Later, in *Arizona* v. *Youngblood*, 488 U.S. 51 (1988), the court reiterated the necessity of showing the apparent exculpatory value of the evidence at issue and further held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*. at 58. The court directed its holding to "those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant." *Id*.

■ Wenzel has made no showing that the evidence possessed any apparent exculpatory value before it was destroyed, as required by the first prong of the standard in *Trombetta*, nor has he alleged or proven bad faith on the part of the State, as required by *Arizona*. Also, from the evidence presented at trial, the chance that the swab samples would have exonerated Wenzel appears virtually nil.

Affirmed.