Ledell LEE *v.* STATE of Arkansas

CR 96-553 942 S.W.2d 231

Supreme Court of Arkansas
Opinion delivered March 24, 1997

[Petition for rehearing denied May 5, 1997.]

694

*Montgomery, Adams & Wyatt, P.L.C.*, by: *Dale E. Adams*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

W.H."Dub" Arnold, Chief Justice. Twenty-six year-old Debra Reese was found brutally murdered in her home at 212 Cherry Street in Jacksonville on February 9, 1993. She had been beaten some thirty-six times with a tire thumper, a tool resembling a baseball bat that her husband Billy, a truck driver, had given to her for protection while he was away. Bruises on Debra's face and neck indicated that she had also been strangled. The appellant, Ledell Lee, was arrested and charged with Reese's murder. Following a jury trial, he was convicted of capital murder and sentenced to death by lethal injection. He raises seven points on appeal. We find no merit to any of his arguments and affirm the conviction and sentence.

Lee does not challenge the sufficiency of the evidence, so we need not recite the facts in great detail. The State's theory at trial was that Lee committed the murder for pecuniary gain, and that he had searched the victim's neighborhood until he found the perfect target for his crime.

William McCullough Jr. lived near the victim's house and had been home on the morning in question. Sometime between 10:00 a.m. and 11:00 a.m., he heard a knock at his door. McCullough went to the door and was met by a man who asked to borrow some tools. McCullough gave the man a driver ratchet and a socket, which he promised to return. The man did not return the tools.

At approximately 10:50 a.m. on the morning of the murder, Katherine Williams, the victim's mother, received a phone call

from her daughter, who lived some four or five houses away. A man had just knocked on the victim's door, asked if her husband was home, and inquired about borrowing some tools. When the victim replied that she had no tools, the man left. According to Katherine, her daughter told her that she was scared and "did not trust this guy." The victim promised her mother that she would be at her house as soon as she finished curling her hair. Her daughter never arrived.

Andy Gomez lived across the street from the victim, and was also home on the morning in question. While looking out his front window, he saw a man standing at the front door of the victim's residence. He watched the man grab the screen door and "make a B-line inside just real fast." Approximately twenty minutes later, the man exited Debra's residence. According to Gomez, the man made rapid head movements, as if he was checking to see if he was being watched. Suspicious, Gomez got in his car to follow the man. He caught up with him on a nearby street, where he observed the man talking to a female with spirals or braids in her hair.

Glenda Pruitt lived at 128 Galloway Circle on the date in question. A man she had seen four or five times and knew as "Skip" walked up her street. Glenda, who wore her hair in long braids, had a short conversation with Skip as he passed by her house. McCullough, Gomez, and Pruitt identified Lee in a photographic lineup as the man they had seen in the victim's neighborhood on the morning of her murder.

Debra's body was discovered in her bedroom at approximately 1:38 p.m. that same date. Three one hundred dollar bills that Debra's father, Stephen Williams, had given to her were missing from her wallet. This money had been part of a larger stack of crisp new bills Williams received in sequential order from the Arkansas Federal Credit Union. At Lee's trial, the State offered evidence that, at 1:53 p.m. on the day of the murder, Lee paid a debt at the Rent-A-Center with a one-hundred dollar bill. Of the three one-hundred dollar bills that the Rent-A-Center received on February 9, one of the bills bore a serial number that was two

bills away from one of the bills that the victim's father had turned over to police.

## I. Selection of jury panel

For his first allegation of error, Lee asserts that the use of voter registration records to select the jury panel in his case denied him a jury comprised of a true cross-section of the community. At the end of voir dire, Lee, who is African–American, observed that only ten of the seventy-five venirepersons assembled were African–American. Lee claims that the State failed to rebut his statistical evidence of systematic exclusion of African–Americans from the jury panel in his case.

■ Selection of a petit jury from a representative cross–section of the community is an essential component of the Sixth Amendment right to a jury trial. *Danzie v. State*, 326 Ark. 34, 930 S.W.2d 310 (1996); *Davis v. State*, 325 Ark. 194, 925 S.W.2d 402 (1996). It is axiomatic that the State may not deliberately or systematically deny to members of a defendant's race the right to participate, as jurors, in the administration of justice. *Davis v. State, supra; Sanders v. State*, 300 Ark. 25, 776 S.W.2d 334 (1989). In order to establish a prima facie case of deliberate or systematic exclusion, a defendant must prove that: (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process. *Duren v. Missouri*, 439 U.S. 357 (1979).

In this case, the first prong of the *Duren* test is clearly met, as African–Americans represent a distinctive group in the community. Regarding the second prong, Lee offered statistical evidence compiled from the 1990 census that Pulaski County has a population of 349,660, of which 58,280 are African–American citizens over age eighteen. Of the 349,600, the county has 200,297 registered voters. Lee also proffered the testimony of a mathematics professor that there was a two-percent chance that the jury panel

in Lee's case could have been randomly selected from the population of Pulaski County.

Lee did not meet his burden of proof by merely showing that the jury venire called in his case was not racially representative of the community. *Davis v. State, supra; Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996). The second prong of the *Duren* test requires a fair and reasonable representation of the distinctive group in *every* venire from which juries are selected, not just the particular venire summoned at his trial. *See Danzie*, 326 Ark. at 43, *citing Duren*, 439 U.S. at 364-66. Lee has not provided us with any evidence as to the number of African-Americans on every jury venire in Pulaski County.

██ In order to satisfy the final prong in *Duren*, Lee must produce evidence that demonstrates that the alleged misrepresentation of African-Americans is due to a systematic exclusion in the jury-selection system itself. Lee acknowledges in his brief our previous holdings that, where the venire is chosen by computer, using the random-selection process maintained by Ark. Code Ann. § 16-32-103 (Repl. 1994), there is no possibility of a purposeful exclusion of African-Americans. Because Lee failed to satisfy the second and third elements of the *Duren* test, the trial court did not err in denying his motion to prohibit the use of voter registration records to select the jury panel in his case.

## II. Destruction of blood evidence

Lee's second point on appeal is that the capital murder charge should have been dismissed due to the destruction of possibly exculpatory evidence. When Lee was arrested and taken into custody on the day of the murder, among the items police seized from him was a pair of Converse tennis shoes he was wearing. Kermitt Channell, a serologist with the State Crime Lab, examined the shoes and observed what he believed to be a small spot of blood on the sole of the left shoe, and another spot on the tongue of the right shoe. Channell performed what he termed a "Takayama test" on the shoes, which confirmed the presence of blood, but consumed the entire sample, thus removing the opportunity for independent analysis by the defense. Lee presented the

testimony of Robert Reis, a professor of biochemistry and molecular biology, who testified that, while Channell had done his job "quite thoroughly," the State Crime Lab's guidelines needed reevaluation since the advent of more sensitive methods of DNA analysis. According to Reis, other tests could have been performed on the shoes without destroying the sample.

Lee claims that his counsel should have been notified that the blood evidence on the shoes was about to be destroyed. He further asserts that the State breached its duty under *Brady v. Maryland*, 373 U.S. 83 (1963), to preserve potentially exculpatory evidence. According to Lee, the State's failure to preserve enough of the sample on the shoes so that he could conduct his own tests deprived him of due process guaranteed by the federal and state constitutions.

■ We addressed a similar claim in *Wenzel v. State*, 306 Ark. 527, 815 S.W.2d 938 (1991). In *Wenzel*, a rape case, the defendant argued that his due process rights were violated when FBI technicians consumed all of the semen samples found on the victims' vaginal swabs. We emphasized that the State's duty to preserve evidence is limited to that which "might be expected to play a significant role in the suspect's defense," and that the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *Wenzel*, 306 Ark. at 532-3, quoting *California v. Trombetta*, 476 U.S. 479, 488-9 (1988). We further explained that, "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Wenzel*, 306 Ark. at 533, quoting *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

■ In this case, Lee makes the broad-brushed assertion in his brief that "the potential value of the evidence to the defense was so obvious that the decision to allow it destroyed suggests bad faith." This bare contention, without supporting facts, does not demonstrate that the State acted in bad faith in destroying the evidence. To the contrary, Channell testified that he performed the

test in accordance with established laboratory guidelines, and that he did not contact the prosecutor or defense counsel to inform them that the sample on the shoes could be consumed, as it was not standard operating procedure to do so. While Lee was free to argue to the jury that alternative testing might have preserved the sample, "the police do not have a constitutional duty to perform any particular tests." *Youngblood*, 488 U.S. at 59. Because Lee has made no showing that the blood evidence on the shoes possessed any exculpatory value before it was destroyed, or that the State in bad faith failed to preserve the sample, Lee's due process claim was properly rejected by the trial court.

■ Alternatively, Lee argues that he was entitled to an order suppressing the use of the shoes as evidence for the State. However, he neither cites authority nor makes a convincing argument for suppression. We have been careful not to consider arguments where an appellant offers no citation of authority or convincing argument and where it is not apparent without further research that the argument is well taken. *Matthews v. State*, 327 Ark. 70, 938 S.W.2d 545 (1997).

### III. Uncharged misconduct evidence

During the State's case-in-chief, Glenda Pruitt testified that she saw Lee shortly after the murder when he passed in front of her house, which was located near the victim's residence. According to Pruitt, she asked Lee, "Where's the fire?" to which he responded, "Well, you are always asking me for weed." Without objection, Pruitt testified that Lee responded that he did not use marijuana, but used cocaine.

During cross-examination, Lee's counsel questioned Pruitt regarding her beliefs and practices as a Rastafarian, particularly with regard to the use of marijuana. He attacked her recollection of her conversation with Lee and whether that recollection was impaired by her use of marijuana. During redirect examination, over Lee's objection, the trial court permitted the State to present the entire conversation between Pruitt and Lee. According to Pruitt, she asked Lee whether he had cocaine "running all through [his] veins," to which he responded, "Yes. It is running all

through me." Pruitt then stated, "Don't you know it (cocaine) is poison?" to which Lee responded, "I'm going to get some now."

■ Lee claims that Pruitt's testimony during redirect was erroneously permitted in violation of A.R.E. 404(b). However, under this rule, evidence of other crimes, wrongs, or acts may be admissible to prove motive. We have said that, when the purpose of evidence is to show motive, anything and everything that might have influenced the commission of the act may, as a rule, be shown. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996); *Cooper v. State*, 324 Ark. 135, 919 S.W.2d 205 (1996). The State is entitled to produce evidence showing circumstances which explain the act, show a motive for killing, or illustrate the accused's state of mind. *Echols v. State, supra; Smith v. State,* 310 Ark. 247, 837 S.W.2d 279 (1992). The State's theory at trial was that Lee murdered the victim for pecuniary gain, which was supported by evidence that money was missing from the victim's wallet. The State was able to produce evidence tying only one of the three missing one hundred dollar bills to Lee. Thus, the State's evidence that Lee was on his way to obtain drugs shortly after the time of the murder was relevant to explain a possible motive for the killing — that he planned to use part of the money he took from the victim to purchase drugs — and to illustrate his state of mind. As we afford great deference to a trial court's ruling on relevancy and prejudicial impact, we cannot say that the trial court in this case abused its discretion in allowing the State to elicit evidence regarding Pruitt's conversation with Lee.

### IV. Overlap of offenses

■ Lee next argues that the overlap between the capital murder and first-degree murder statutes violates the Eighth and Fourteenth Amendments. Particularly, he claims that these statutes overlap in their elements, are void for vagueness, fail to narrow the class of offenders, and grant unbridled discretion to the prosecutor. We have decided this issue adversely to Lee's position on many occasions, and adhere to these previous holdings. *See Echols v. State, supra; Nooner v. State,* 322 Ark. 87, 907 S.W.2d 677 (1995), *cert. denied,* 116 S.Ct. 1436 (1995).

## *V. Victim-impact evidence*

■ Lee challenges Arkansas's victim-impact statute, Ark. Code Ann. § 5-4-602(4) (Repl. 1993), as violative of due process. He claims that, by enacting the statute, the legislature has improperly created a new aggravating circumstance. He further complains that there is no place in the statutory weighing process for the jury to consider victim-impact evidence. In making his argument, Lee asks us to reconsider our decisions in *Kemp v. State, supra*; and *Nooner v. State, supra*. We decline to do so. In *Kemp*, we explained that the jury could consider victim-impact evidence at the same time it considers the mitigating evidence introduced by the defendant. *Kemp*, 324 Ark. at 204–205, *citing Payne v. Tennessee*, 501 U.S. 808, 826 (1991). Recognizing that there are virtually no limits placed on the relevant mitigating evidence that a defendant may introduce on his behalf, we noted that the State could legitimately conclude that the impact of the murder on the victim's family is relevant to the jury's decision as to whether to recommend that the death sentence be imposed. *Kemp*, 324 Ark. at 205, *citing Payne*, 501 U.S. at 827. We further recognized that the jury need not be instructed how to weigh any particular fact in the capital-sentencing decision, as a contrary rule would require a mandatory sentencing scheme. *Kemp*, 324 Ark. at 205, *citing Tuilaepa v. California*, 114 S.Ct. 2630, 2639 (1994).

■ We recognized in *Kemp* that, when evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. *Kemp*, 324 Ark. at 205. In this case, Lisa Buchan, the victim's sister, was the State's only victim-impact witness. She testified that her sister and mother spent most of every day together. Her parents were on antidepressants after the incident, and her mother was under psychiatric care. Prior to her death, the victim lived with her husband of seven months and her seven-year-old son from a previous marriage, and was trying to have another child. Lisa, who was pregnant during the trial, stated that she would name her child after her sister. She also related the painful experience of selecting her sister's wig for her funeral. We cannot agree that Lisa's testi-

mony was so unduly prejudicial that it rendered Lee's trial fundamentally unfair.

## VI. Arbitrary and discriminatory

 Lee filed a written motion to prohibit the State from seeking the death penalty in his case because, according to him, the death penalty has been historically applied arbitrarily and capriciously and in a racially discriminatory fashion. In support of his argument, he cites a law review article and references the fact that he is black and the victim was white. *See* "Patterns of Deaths: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization," 37 Stan. L. Rev. 27 (1984). We considered this argument and law review article in *Nooner v. State, supra*. In *Nooner*, we emphasized the United States Supreme Court's requirement that a discriminatory purpose must be proved on the part of the decision-maker in the defendant's particular case. *McClesky v. Kemp*, 481 U.S. 279 (1987). As in *Nooner*, Lee's allegations are very general. He has offered no proof to show how his due process or equal protection rights were violated by a biased or arbitrary judge or jury. Thus, due to absence of proof of discriminatory purpose, we cannot say that the trial court erred in denying Lee's motion.

## VII. Severance

Finally, Lee presents the argument that the trial court erred in denying his motion for severance of the crimes relied on by the State as aggravating circumstances. He claims that the failure to sever these offenses violated Rules 21 and 22 of the Arkansas Rules of Criminal Procedure.

During the penalty phase, the State offered evidence that Lee had previously committed three other felonies, elements of which included the use or threat of violence to another person or the creation of a substantial risk of death or serious injury to another person. *See* Ark. Code Ann. § 5-4-604(3) (Repl. 1993). The State offered the testimony of three witnesses, all of whom testified that Lee had raped them. The fourth aggravating circumstance alleged was that Lee committed the murder for pecuniary

gain. The jury unanimously found that all four aggravating circumstances existed beyond a reasonable doubt at the time of the murder. They also found that there was evidence that Lee's father abandoned him from birth, that he had no real father, and that he came from a dysfunctional family. However, the jury unanimously found that this evidence did not constitute a mitigating circumstance. The jury concluded that the aggravating circumstances' justified beyond a reasonable doubt a sentence of death.

█ Rules 21 and 22 of the Arkansas Rules of Criminal Procedure pertain to the joinder and severance of offenses and defendants. Particularly, Rule 22.2 provides that, whenever two or more offenses have been joined for trial solely on the ground that they are of the same or similar character, and the offenses are not part of a single scheme or plan, the defendant shall have a right to a severance of the offenses. In this case, Lee was charged by felony information with a single count of capital murder. In this charging instrument, Lee was accused of the premeditated and deliberate killing of Debra Reese. The three offenses relied on by the State as aggravating circumstances during the penalty phase were not included in the felony information, and were not joined at Lee's trial with the capital murder charge. Quite simply, the rules regarding severance do not apply, as there were no charges to sever from the capital murder charge.

█ Lee further claims that the admission of this evidence violated his due process rights and subjected him to cruel and unusual punishment in violation of the federal and state constitutions. However, he cites no convincing authority or facts in support of his bare assertion of error. Again, we will not consider such unsupported arguments on appeal. *Matthews v. State, supra.*

█ Additionally, Lee claims that the trial court should have viewed the evidence of the three previous felonies *in camera* before the evidence was presented to the jury during the penalty phase. In support of his argument, Lee cites *Miller v. State,* 280 Ark. 551, 660 S.W.2d 163 (1983). In that case, the State failed to prove beyond a reasonable doubt that Miller had previously committed a crime involving violence. To the contrary, in this case, the State offered proof that Lee had been convicted of one of the

rapes. Regarding the other two offenses, the State offered testimony of the two victims as well as testimony from an FBI agent who testified that the probability of the rapist being someone other than Lee was one in one billion in one of the cases, and one in eighty billion in the other. In light of this evidence, the State proved beyond a reasonable doubt that Lee had committed these offenses. As such, Lee cannot demonstrate that he was prejudiced by the absence of an *in camera* hearing.

### VIII. Other errors

The transcript of the record in this case has been reviewed in accordance with Arkansas Supreme Court Rule 4-3(h), which requires, in cases in which there is a sentence of life imprisonment or death, that we review all prejudicial errors in accordance with Ark. Code Ann. § 16-91-113(a) (1987). None have been found.

Affirmed.

NEWBERN, J., concurs.

DAVID NEWBERN, Justice, concurring. We often refer to the "safeguards" and "protections" that we say preclude the arbitrary imposition of the death penalty. *See, e.g., Hill v. State,* 289 Ark. 387, 713 S.W.2d 233 (1986); *Clines v. State,* 280 Ark. 77, 656 S.W.2d 684 (1983). We reject constitutional challenges to our death-penalty statutes and boast that the statutes are carefully drawn and that they comply with the mandates of the United States Supreme Court by curtailing the jury's discretion in meting out "this unique penalty," *Gregg v. Georgia,* 428 U.S. 153, 188 (1976)(joint opinion of Stewart, Powell, and Stevens, JJ.), *quoting Furman v. Georgia,* 408 U.S. 238, 310 (1972)(Stewart, J., concurring), and by permitting "the sentencer to make a principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers,* 497 U.S. 764, 776 (1990).

The majority opinion in the case at bar may well sap some of the pride we have taken in our laws promoting the orderly narrowing of the class of persons eligible for the death penalty. Today we sanction, as we have done before, the admission of victim-impact evidence in the sentencing phase of a death-penalty case.

Although I concur in the affirmance of Mr. Lee's conviction and sentence, I write separately to express my reservations about the use of victim-impact evidence in capital cases because it may frustrate the statutory scheme designed to provide, as it must, "adequate safeguards against the capricious and freakish imposition of the death penalty." *Collins v. State,* 261 Ark. 195, 202, 548 S.W.2d 106, 110 (1977).

The death-penalty sentencing procedures that we so often have sustained are as follows. The jury in a capital-murder case is required to impose the death penalty *if* it unanimously returns written findings that:

(1) Aggravating circumstances exist beyond a reasonable doubt; and

(2) Aggravating circumstances outweigh beyond a reasonable doubt all mitigating circumstances found to exist; and

(3) Aggravating circumstances justify a sentence of death beyond a reasonable doubt.

Ark. Code Ann. § 5-4-603(a) (Repl. 1993).

As we have held, this statute means that "[a] jury cannot impose a sentence of death until it specifically finds that all three parts of the statute apply." *Hill v. State,* 289 Ark. at 397, 713 S.W.2d at 238. Even if the jury finds beyond a reasonable doubt that aggravating circumstances exist and outweigh any mitigating circumstances, "it is still free to return a verdict of life without parole, simply by finding that the aggravating circumstances do not justify a sentence of death." *Id. quoting Clines v. State, supra.* Thus, the imposition of the death penalty is not mandatory. Moreover, "the trial judge is not required to impose the death penalty in every case in which the jury verdict prescribes it," *id.,* and "[w]e have demonstrated our readiness to modify the death sentence where it is imposed capriciously . . . or where death is unduly harsh under the circumstances." *Clines v. State,* 280 Ark. at 84-85, 656 S.W.2d at 687 (citations omitted).

The aggravating circumstances that a jury may consider are strictly limited to the following nine:

(1) The capital murder was committed by a person imprisoned as a result of a felony conviction;

(2) The capital murder was committed by a person unlawfully at liberty after being sentenced to imprisonment as a result of a felony conviction;

(3) The person previously committed another felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person;

(4) The person in the commission of the capital murder knowingly created a great risk of death to a person other than the victim or caused the death of more than one (1) person in the same criminal episode;

(5) The capital murder was committed for the purpose of avoiding or preventing an arrest or effecting an escape from custody;

(6) The capital murder was committed for pecuniary gain;

(7) The capital murder was committed for the purpose of disrupting or hindering the lawful exercise of any government or political function;

(8)(A) The capital murder was committed in an especially cruel or depraved manner.

(B) For purposes of this subdivision (8), a capital murder is committed in an especially cruel manner when, as part of a course of conduct intended to inflict mental anguish, serious physical abuse, or torture upon the victim prior to the victim's death, mental anguish, serious physical abuse, or torture is inflicted. "Mental anguish" is defined as the victim's uncertainty as to his ultimate fate. "Serious physical abuse" is defined as physical abuse that creates a substantial risk of death or that causes protracted impairment of health, or loss or protracted impairment of the function of any bodily member or organ. "Torture" is defined as the infliction of extreme physical pain for a prolonged period of time prior to the victim's death.

(C) For purposes of this subdivision (8), a capital murder is committed in an especially depraved manner when the person relishes the murder, evidencing debasement or perversion, or shows an indifference to the suffering of the victim and evidences a sense of pleasure in committing the murder; or

(9) The capital murder was committed by means of a destructive device, bomb, explosive, or similar device which the person planted, hid, or concealed in any place, area, dwelling, building, or structure, or mailed or delivered, or caused to be planted, hidden, concealed, mailed, or delivered, and the person knew that his act or acts would create a great risk of death to human life.

§ 5-4-604 (Supp. 1995).

Although "the jury's consideration of aggravating circumstances is limited to those enumerated," the jury's "consideration of mitigating circumstances is not necessarily so restricted." *Giles v. State,* 261 Ark. 413, 420, 549 S.W.2d 479, 483 (1977). The General Assembly has provided that

[m]itigating circumstances shall include, but are not limited to, the following:

(1) The capital murder was committed while the defendant was under extreme mental or emotional disturbance;

(2) The capital murder was committed while the defendant was acting under unusual pressures or influences or under the domination of another person;

(3) The capital murder was committed while the capacity of the defendant to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, intoxication, or drug abuse;

(4) The youth of the defendant at the time of the commission of the capital murder;

(5) The capital murder was committed by another person and the defendant was an accomplice and his participation relatively minor;

(6) The defendant has no significant history of prior criminal activity.

Ark. Code Ann. § 5-4-605 (Repl. 1993). *See Sheridan v. State,* 313 Ark. 23, 38, 852 S.W.2d 772, 779 (1993) (stating "the defense must be allowed during the sentencing phase to introduce *any* relevant mitigating evidence the defense proffers concerning the character or history of the offender or the circumstances of the offense")(citations omitted)(emphasis added).

The statutory provisions are quoted at length to demonstrate *exactly* what the jury is permitted to consider in determining whether to impose the death sentence. The statutes prescribe a tidy formula. In determining whether the death penalty is justified, the jury must consider *only* whether the evidence has demonstrated beyond a reasonable doubt that (1) one or more of the enumerated aggravating circumstances exist in the case at hand; (2) the aggravating circumstances outweigh any mitigating circumstances; and (3) the aggravating circumstances justify the imposition of the death penalty.

When the jury is requested to impose the death penalty in a capital case, its sole task during the penalty phase is to evaluate the evidence of aggravating and mitigating circumstances and make certain findings with respect to that evidence. Nothing more, and nothing less, may figure into the equation according to § 5-4-603(a). Therefore, as our cases have intimated, the Trial Court should allow into evidence during the sentencing phase of a death-penalty case only that which is relevant to the aggravating and mitigating circumstances alleged by the parties. *See Hendrickson v. State,* 285 Ark. 462, 466, 688 S.W.2d 295, 298 (1985)(stating "the evidence offered must be probative of some issue to be properly considered in the penalty phase"). Where the State seeks the death penalty, the only issue that is "properly considered" by the sentencing-phase jury is whether aggravating circumstances exist, whether they justify the imposition of the death penalty, and whether they outweigh the mitigating circumstances. Thus, the evidence presented to the jury during the sentencing phase of a death-penalty case should be relevant to these issues.

This is the regime that we have found to be constitutionally sound. As we have held, a sentencing structure — such as the one created by Ark. Code Ann. §§ 5-4-603(a) to 5-4-605 and their predecessors — that permits the jury to impose the death penalty after considering evidence of aggravating and mitigating circumstances and making certain findings with respect to that evidence "provides adequate guidelines, so limiting and directing the exercise of the jury's discretion that an arbitrary, capricious, wanton or freakish exercise of that discretion is improbable." *Collins v. State,* 261 Ark. at 203, 548 S.W.2d at 111. This particular procedure,

we have found, passes constitutional muster because it "genuinely narrow[s] the class of persons eligible for the death penalty and . . . reasonably justif[ies] the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Lowenfield v. Phelps,* 484 U.S. 231, 244 (1988), *quoting Zant v. Stephens,* 462 U.S. 862, 877 (1983). According to our cases, it is entirely appropriate for the jury to perform the function of narrowing the class of death-eligible defendants at the penalty phase of a bifurcated trial. *See Johnson v. State,* 308 Ark. 7, 823 S.W.2d 800 (1992).

My concern is that the admission of victim-impact evidence in capital sentencing proceedings pursuant to Ark. Code Ann. § 5-4-602(4) (Repl. 1993) may, without appropriate limitations, make undesirable and unintended changes in the accepted method by which juries in Arkansas have determined whether the "unique penalty" of death is justified in a given case.

As noted, § 5-4-603(a) mandates that the jury's decision to impose the death penalty rest solely upon a careful evaluation of the evidence, if any, establishing aggravating and mitigating circumstances as they are defined by §§ 5-4-604 and 5-4-605. The evidence that a jury receives should be relevant to the existence, or non-existence, of aggravating or mitigating circumstances. Despite the logic of this position, and despite the clear mandate of § 5-4-603(a), § 5-4-602(4) permits, without restriction, the admission of victim-impact evidence in the sentencing phase of a death-penalty case. Section 5-4-602(4) provides as follows:

> In determining sentence, evidence may be presented to the jury as to any matters relating to aggravating circumstances enumerated in § 5-4-604, any mitigating circumstances, *or any other matter relevant to punishment, including, but not limited to, victim impact evidence,* provided that the defendant and the state are accorded an opportunity to rebut such evidence. Evidence as to any mitigating circumstances may be presented by either the state or the defendant regardless of its admissibility under the rules governing admission of evidence in trials of criminal matters, but mitigation evidence must be relevant to the issue of punishment, including, but not limited to, the nature and circumstances of the crime, and the defendant's character, background, history, and mental

and physical condition as set forth in § 5-4-605. The admissibility of evidence relevant to the aggravating circumstances set forth in § 5-4-604 shall be governed by the rules governing the admission of evidence in trials of criminal matters. Any evidence admitted at the trial relevant to punishment may be considered by the jury without the necessity of reintroducing it at the sentencing proceeding. The state and the defendant or his counsel shall be permitted to present argument respecting sentencing. The state shall open the argument. The defendant shall be permitted to reply. The state shall then be permitted to reply in rebuttal.

Ark. Code Ann. § 5-4-602(4) (Repl. 1993) (emphasis added).

The jury's ability to perform its duty under § 5-4-603(a) could be undermined by the admission of victim-impact evidence pursuant to § 5-4-602(4). Section 5-4-603(a) requires the jury to consider only evidence of aggravating and mitigating circumstances in deciding whether to impose the death penalty. In the sentencing phase of a death-penalty case, therefore, the jury, in performing the "narrowing function" described above, should be allowed to consider only that evidence that tends to establish the existence, or nonexistence, of aggravating and mitigating circumstances.

Instead, the jury in the penalty phase is permitted by § 602(4) to consider as well any victim-impact evidence that is merely "relevant to punishment." The danger posed by this language is that it could be construed as permitting the introduction of victim-impact evidence that, while "relevant to punishment" in the abstract, has absolutely no bearing on the only question that the jury is supposed to consider in a death-penalty case — that is, whether imposition of the death penalty is justified under § 5-4-603(a) in light of the evidence concerning aggravating and mitigating circumstances.

If victim-impact evidence is irrelevant to this determination, then its admission in the sentencing phase would unquestionably interfere with the jury's ability to perform its narrowing function under § 603(a). The jury clearly should not be permitted to receive evidence that has no tendency to make the existence of aggravating or mitigating circumstances "more probable or less probable than it would be without the evidence." Ark. R. Evid.

401. Moreover, there is no question that §§ 603(a), 604, and 605 do not permit the jury to rely on victim-impact evidence in determining whether aggravating circumstances exist, whether they justify the imposition of the death penalty, and whether they outweigh any mitigating circumstances. Furthermore, § 602(4), in providing for the admission of victim-impact evidence, did not create a "new" aggravating circumstance that could justify imposition of the death penalty under § 603(a). We said as much in *Nooner v. State,* 322 Ark. 87, 109, 907 S.W.2d 677, 689 (1995), and it is also evident that the fact that a murder had a certain "impact" on the victim or the victim's survivors could not, under the U.S. Supreme Court's death-penalty jurisprudence, constitute a valid aggravating circumstance because it would not "genuinely narrow the class of persons eligible for the death penalty" or "reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens, supra.* Every murder results in a deleterious impact on the victim or the victim's survivors, and thus evidence establishing such an impact could not permit the jury to perform its narrowing function.

To be admissible in a capital sentencing procedure, victim-impact evidence must be directly relevant to an aggravating or mitigating circumstance. Although § 5-4-602(4) provides that victim-impact evidence may be presented if it is "relevant to punishment," that language, at least in the context of a death-penalty case, should be read in conjunction with § 5-4-603(a), which requires the jury to consider only evidence bearing on aggravating and mitigating circumstances in determining whether to impose the death penalty. A relevancy-based limitation on the use of victim-impact evidence is not prohibited by the language of § 5-4-602(4). In fact, unless these statutes are interpreted as imposing this limitation, the statutes will have the absurd result of permitting the admission of evidence that can have no effect on the jury's decision to impose the death penalty. In a death-penalty case, victim-impact evidence should not be admitted if it will distract the jury from completing the task assigned to it by § 603(a). Evidence that is irrelevant to an aggravating or mitigating circumstance would do just that.

The U.S. Supreme Court held in *Payne v. Tennessee,* 501 U.S. 808 (1991), that the Eighth Amendment to the U.S. Constitution imposes no *per se* bar to the introduction of victim-impact evidence in a capital sentencing proceeding. In the *Payne* case the Court held

> that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no *per se* bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Payne v. Tennessee,* 501 U.S. at 827. The Court reasoned that victim-impact evidence "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities," and that such evidence could reasonably assist the jury in "assess[ing] meaningfully the defendant's moral culpability and blameworthiness." *Id.* at 825. *See generally* K. Elizabeth Whitehead, Mourning Becomes Electric: *Payne v. Tennessee*'s Allowance of Victim Impact Statements During Capital Sentencing Proceedings, 45 ARK. L. REV. 531 (1992).

Although it is difficult to think of victim-impact evidence that might add to any of the statutory mitigating factors, perhaps such evidence could relate to one of the statutory aggravating factors, although it is hard to imagine how unless it would be admissible regardless as direct evidence of one of the statutory aggravating factors. Given the manner in which we have attempted to satisfy the constitutional requirement of narrowing the class of persons eligible for the death penalty, however, we should not allow victim-impact evidence in a capital sentencing proceeding unless it is directly relevant to the elements of mitigation and aggravation specified in the statutes. *See, e.g., Lambert v. State,* 1996 WL 744864 (to be reported at 675 N.E.2d 1060, ___ (Ind. 1996)) (holding that, "in death penalty cases, the only admissible victim impact testimony is that testimony which is relevant to

a statutory aggravating or mitigating circumstance"). *See also Bivins v. State,* 642 N.E.2d 928 (Ind. 1994).

In the case at bar, I have serious doubts whether the victim-impact evidence presented to the jury was relevant to any of the aggravating and mitigating circumstances raised by the parties. Mr. Lee did not, however, seek to exclude that evidence on the basis of relevancy. Likewise, on appeal, Mr. Lee raises no relevancy-based argument. He simply argues that the victim-impact statute violates due process and that we should reconsider our previous holdings affirming the validity of § 5-4-602(4). I agree that suppression of the victim-impact evidence in this case was not required on the basis of the arguments presented to the Trial Court and to this Court on appeal, and I therefore concur in the result reached by the majority.