2012 Ark. App. 276

**Cordell A. WELLS, Jr., Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CA CR 11–769.**

Court of Appeals of Arkansas.

April 18, 2012.

W. Ray Nickle, Nickle Law Firm, Jonesboro, for Appellant.

Dustin McDaniel, Attorney General, Brad Newman, Assistant Attorney General, Little Rock, for Appellee.

WAYMOND M. BROWN, Judge.

Appellant Cordell Wells, Jr., was convicted by a Mississippi County jury of first-degree murder, carrying a prohibited weapon, and fleeing. He also received a firearm enhancement. He was sentenced to an aggregate of fifty-five years' imprisonment. He argues on appeal that the court erred by denying him his fundamental right to a fair trial and that it erred by denying his motion for directed verdict. We find no error and affirm.

On November 6, 2009, Wells fatally shot Wale Adelowo in the carport of Adelowo's home. Officer Terry Byrd of the Blytheville Police Department testified that he was the first officer on the scene. He

stated that when he made it to Adelowo's house, Adelowo was breathing, but was not responding. He said that he noticed blood but no injuries on Adelowo. Officer Byrd stated that once paramedics arrived, he along with other officers began securing the perimeter. He said that while he was at the scene, he helped remove a [2]bullet from the driver's side door of a Camaro parked in Adelowo's carport. Officer Danny Bishop testified that he was the second officer on the scene. He said that once he got there, he noticed wounds to Adelowo's lower body, hips, and hands. He stated that he recovered between five to eight shell casings next to a privacy fence separating Adelowo's property from his neighbor's property.

Shayla Adelowo testified that she was the victim's wife. According to Mrs. Adelowo, she was inside on the phone when Adelowo was shot. Mrs. Adelowo said that Adelowo had been outside washing his car on the evening of November 6, 2009. She stated that she dropped the phone when she heard the shots and went outside to see what had happened. She testified that she found her husband lying between the porch and the carport. Mrs. Adelowo said that she placed a comforter over Adelowo. She denied seeing anyone outside with Adelowo that evening. On cross-examination, she stated that she did not know what happened or who shot Adelowo. She also said that Adelowo did not have any work or financial problems to her knowledge.

Dale Robinson testified that he saw Adelowo in his carport talking to someone on the evening of November 6, 2009. He stated that the two men looked like they were just talking and that he did not see anything strange about it. He said that he had to sit at the stop sign at the intersection of Leawood and Moultrie for a few minutes because "there was a lot of traffic that night." He testified that he heard gunshots, looked over his shoulder, and saw Adelowo fall. Mr. Robinson stated that after that, a "fellow" ran up to the Robinson's vehicle and placed his hand on the front end of the vehicle. He said that the person looked [3]at his wife and him and continued .running across the street. Mr. Robinson testified that he did not know what the person looked like but that he "had on a camouflaged jacket and a white hoodie or scarf over his head." He stated that he called 9–1–1 and backed up to Adelowo's house to get someone's attention. On cross-examination, Mr. Robinson said that Adelowo waved at him when he was turning the corner. He admitted that he did not see the shooting and that he did not know what transpired between Adelowo and Wells during the five to seven minutes he sat at the stop sign.

Maudie Robinson testified that she was in the vehicle with her husband on the evening of November 6, 2009. She stated that she saw Adelowo talking to someone as they turned onto Leawood. She said that she heard some shots and turned back in time to see Adelowo fall to the ground. According to Mrs. Robinson, she told her husband, "he shot him." Mrs. Robinson testified that she then saw the individual running with what she assumed was a gun in his hand. She stated that the shooter was wearing a camouflage jacket.

Sergeant Kyle Lively testified that he was home, about two blocks from Adelowo's home, on the evening of November 6, 2009. According to Sergeant Lively, he heard several gunshots and walked outside. He stated that he saw someone run across the street with a gun in his hand. Sergeant Lively stated that he called in the shots fired and then got in his vehicle to "try to intercept the subject that was running." He said that he got out of his vehicle and gave Wells a command to

stop.[1] At that time, Wells kicked off his shoes and started running. Sergeant Lively stated that he caught Wells a short distance later and was able to handcuff him once another unit arrived. He testified that when Wells was lifted, a Glock pistol was found underneath him. He stated that the gun found with Wells was the same type carried by police officers. He said that the slide of the gun was locked to the rear indicating that "all of the rounds have been fired out of that, out of the weapon."

On cross-examination, Sergeant Lively testified that when he first saw Wells, Wells was walking. Once he made contact with Wells and asked him to stop, Wells kicked off his shoes and started running. He said that Wells's gun had a fifteen-round magazine.

Detective Jason Eddings testified that he found seven .40 caliber spent shell casings at the scene. He stated that he also went to the scene of Wells's arrest and "observed two brown work-style type boots and a Glock 22 model .40 caliber handgun." He said that he made contact with Wells at the police department and that he did not notice any injuries on Wells.

On cross-examination, Detective Eddings stated that if Wells had been injured, a medic or ambulance would have been called to that location. He said that there was a bullet in the driver's side door of the Camaro in Adelowo's carport. He also stated that there was not a gun "in plain view" in the Camaro but that he could not say that there was not a gun in the vehicle. Detective Eddings testified that five shell casings were found on one side of the privacy fence and two on the

other side. On redirect, Detective Eddings said that he never received any information that the victim had a gun that day.

According to Dr. Daniel Konzelmann, an associate medical examiner at the Arkansas State Crime Laboratory, Adelowo suffered eight gunshot wounds: one to the middle of the back, which was recovered in the right chest; one to the left hip, which came to rest in the mid-line of the left buttock; one to the inside of the mid-line side of the right buttock; one to the inside back of the right thigh, which exited the front of the right thigh; one to the left abdomen, which passed through the tail of the pancreas, the stomach, left liver lobe, and then entered the right heart, passed in front of the right lung and into the right upper chest wall muscle and came to rest below the right clavicle; one to the right lower arm, which exited close to the elbow; one to the left lower abdomen, which came to rest in the muscles along the lower part of the spine called the iliopsoas; and one to the left hand, which came out of the palm.[2] As a result of the wounds, Adelowo suffered internal injuries to his subcutaneous tissues, muscle, liver, pancreas, diaphragm, and right heart ventricle. The cause of death was multiple gunshot wounds, and the manner of death was homicide. The medical report stated that Adelowo was shot at close range.

On cross-examination, Dr. Konzelmann stated that he also found evidence of blunt-force injury: scrapes of the left knee and scratches and an abrasion on the inside of the left wrist. He said that these injuries could be consistent with a scuffle. He testified that the evidence showed at least some movement by the victim because his

---

1. He testified that he was in uniform at the time he gave Wells the verbal command to stop.

2. Dr. Konzelmann stated that it was possible that this bullet reentered the body in the arm.

body was located in a different location from "definite blood evidence." On redirect, he stated that the location of Adelowo's gunshot wounds indicate movement by either Adelowo or the shooter. He also said that it was very unlikely for a person who is being shot to stand in one position.

Chantelle Taylor, a criminalist in the trace-evidence section of the Arkansas Crime Laboratory, testified that "gunshot residue" was located on both of Wells's hands. Zachery Elder, a firearm-toolmark examiner with the Arkansas State Crime Laboratory, testified that he could neither identify nor eliminate the recovered bullets as being fired through the barrel of Wells's gun.[3] He did, however, testify that the seven shell casings recovered from the scene had been discharged from Wells's gun.

Wells testified that he met Adelowo while working at Denso. According to Wells, Adelowo was supposed to be training Wells. Wells stated that Adelowo began "pickin" on him by calling him slow and telling him that he had "b*tch hands." Wells said that he thought it was just a phase that would eventually pass, but it never did. He stated that Adelowo would try to intimidate him with Adelowo's size. Wells testified that Adelowo accused him of vandalizing Adelowo's car by throwing eggs on it the day after Halloween. Wells said that he went to the restroom that day and that he had to pass by the locker room. According to Wells, Adelowo was in the locker room and showed Wells his gun. Wells testified that Adelowo did not say anything, he "just gave [him] a look." Wells stated that the bullying continued and that on November 6, 2009, Adelowo made a comment about doing something to Wells and put his hands on Wells's head. He said that when he got off of work that day, he went to pick up his check, went by

his mother's job, and went to his girlfriend's house. He stated that he later left to do some yard work for his mother. According to Wells, he took off his leather jacket and put on his mother's ex-husband's hunting jacket. He said that he also retrieved his gun when he got to his mother's house. Wells testified that after he finished raking leaves, he decided to go over to Adelowo's house to talk about the bullying. He said that he drove his truck and parked it at Adelowo's neighbor's house. He testified that he walked over and started talking to Adelowo. He stated that Adelowo commented, "you come into my house with this mess," so he turned around to leave. According to Wells, Adelowo put him in a choke-hold, and when Adelowo let him go, Adelowo stated that he was going to get his gun. He continued,

> I grabbed my gun and I seen him when I turned around I seen him reaching at that car door and I aimed at his legs and I shot twice. I was standing on the ground. After I shot twice, he said, augh. But he didn't fall though he kept trying to scramble and try to get to that car door. And I kept firing at his legs. No, I wasn't trying to kill him. I didn't go over there to shoot him. I started shooting at his legs hoping that he would fall so I could get to my truck. Eventually he fell.

> When I seen him fall I just was lookin' 'cause it was blood and stuff and I was froze for a minute. And then I just remember it was just, everything just happened so fast and I was just scared. I just remember just runnin'. No, I didn't go to my truck. I don't even know where I was runnin' to. I was just runnin'. The thing I remember, I remember crossing the street and my

---

**3.** The gun was actually purchased and registered by Wells's father, Cordell Wells, Sr.

asthma started acting up and I started walking and I walked, I walkin' (sic) and I heard a hey. And that scared me so I kicked off my boots and I started runnin' some more and then I just fell 'cause I couldn't breath. Yes, it was a police officer who yelled at me. They took me to jail.

He stated that he had never been in trouble or to jail before November 6, 2009.

On cross-examination, Wells stated that Adelowo's bullying did not upset him, it just bothered him. He said that he did not report Adelowo's actions to his supervisor because he was hoping that it would eventually stop. He testified that he felt that Adelowo looked at him in a threatening manner the day he saw Adelowo with a gun at work. He acknowledged that he did not report this incident. Wells testified that he retrieved his handgun from his mother's house before he started raking her yard. He stated that one reason he had the gun was because of his mother's ex-husband. However, he testified that he was always armed. He stated that he lived with his father at the time but that he kept his gun at his mother's house. Wells said that he knew how to find Adelowo's house because Adelowo was "bragging about his house and where he lived." He testified that Adelowo told him to leave and that he was attempting to do so when Adelowo tackled him and put him in a choke-hold. He stated that when Adelowo let him go and turned away to walk toward the car, he shot Adelowo in the legs twice. He said that he kept shooting when Adelowo did not go down. He stated that he was on his back for two of the shots. He said that he did not know why he did not tell Sergeant Lively that Adelowo had just attacked him and that was why he had to shoot Adelowo. He insisted that he went to Adelowo's house to make peace, not to shoot him. He also stated that he never told an officer about a possible gun being in Adelowo's Camaro.

The jury found Wells guilty of first-degree murder, carrying a prohibited weapon, and fleeing. He was sentenced to fifty-five years in the Department of Correction. He filed a timely notice of appeal. This appeal followed.

■ Wells asserts on appeal that the circuit court erred in failing to grant his directed-verdict motion. The crux of his argument is that he lacked the requisite intent for first-degree murder. He contends that he caused Adelowo's death in self-defense. Although Wells raises this issue as his second point on appeal, double-jeopardy concerns require that we review arguments regarding the sufficiency of the evidence first.[4]

■ An appeal from a denial of a motion for directed verdict is a challenge to the sufficiency of the evidence.[5] When reviewing a challenge to the sufficiency of the evidence, this court determines whether the verdict was supported by substantial evidence, direct or circumstantial.[6] Substantial evidence is evidence that is forceful enough to compel a conclusion one way or the other beyond speculation or conjecture.[7] The reviewing court views the evidence in the light most favorable to the verdict and considers only evidence that supports the verdict.[8] Circumstantial evidence may constitute substantial evi-

---

4. *Boldin v. State*, 373 Ark. 295, 297, 283 S.W.3d 565, 567 (2008).

5. *Price v. State*, 373 Ark. 435, 438, 284 S.W.3d 462, 465 (2008).

6. *Id.*

7. *Id.*

8. *Id.*

dence to support a conviction.[9] The long-standing rule in the use of circumstantial evidence is that, to be substantial, the evidence must exclude every other reasonable hypothesis than that of the guilt of the accused.[10] This question is for the jury to decide.[11] Upon review, this court must determine whether the jury resorted to speculation and conjecture in reaching its verdict.[12] The credibility of witnesses is an issue for the jury and not the court.[13] The trier of fact is free to believe all or part of any witness's testimony and may resolve questions of conflicting testimony and inconsistent evidence.[14]

The intent necessary for first-degree murder may be inferred from the type of weapon used, the manner of its use, and the nature, extent, and location of the wounds.[15] A person commits first-degree murder if "[w]ith a purpose of causing the death of another person, the person causes the death of another person." [16] A criminal defendant's intent or state of mind is seldom capable of proof by direct evidence and must usually be inferred from the circumstances of the crime.[17] Furthermore, we have consistently entertained the presumption that one intends the natural and probable consequence of one's actions.[18]

Wells does not deny shooting Adelowo; however, he contends that it was not his intent to kill Adelowo. Wells argues that he only shot Adelowo because Wells was in fear for his life. The existence of criminal intent or purpose is a matter for the jury when criminal intent may be reasonably inferred from the evidence.[19] Here, the evidence presented was sufficient to support the jury's finding of intent by Wells. Adelowo was shot at least seven times and suffered several gunshot wounds to the back and front of his body. Wells testified that when he first began shooting Adelowo, Adelowo's back was to him. Adelowo suffered severe internal injuries as a result of the shooting. Although Wells maintains his self-defense theory, there were no weapons located on or near Adelowo, and Wells did not display any signs of injury. Finally, evidence of Wells's flight immediately after the murder further supports the jury's verdict. It is well settled that flight is probative evidence of guilt.[20]

Based on the evidence, we cannot say that the jury resorted to speculation and conjecture in reaching its verdict. The circumstances of the crime give rise to an inference of intent. Accordingly, we hold that the circuit court did not err by denying Wells's motion for directed verdict.

Next, Wells argues that the circuit court denied him of his fundamental right to a fair trial. More specifically, he ar-

9. *Id.*

10. *Id.*

11. *Id.*

12. *Id.*

13. *Id.*

14. *Id.*

15. *Walker v. State*, 324 Ark. 106, 918 S.W.2d 172 (1996).

16. Ark.Code Ann. § 5–10–102(a)(2) (Repl. 2006).

17. *Leaks v. State*, 345 Ark. 182, 45 S.W.3d 363 (2001).

18. *Coggin v. State*, 356 Ark. 424, 156 S.W.3d 712 (2004).

19. *Kendrick v. State*, 37 Ark.App. 95, 98, 823 S.W.2d 931, 933 (1992).

20. *Gillard v. State*, 366 Ark. 217, 234 S.W.3d 310 (2006).

gues that the petit jury did not represent a cross-section of the community. Wells contends that by the time his trial came around, 139 persons had already been excused from the 263–person jury pool. He further states that of the remaining 124 potential jurors, only forty-nine showed up for jury duty. He makes no specific argument that he was prejudiced by the jury-selection process. He argues that by "being forced to select a jury from 49 individuals (out of 263) which are not representative of a fair cross-section[12] of the community in a first-degree murder trial violates an individual's fundamental constitutional right to a fair trial pursuant to the Sixth Amendment to the United States Constitution." He also contends that there was no reason given for excusing the potential jurors and that there was no information concerning their race or demographics.

We have repeatedly held that selection of a petit jury from a representative cross-section of the community is an essential component of the Sixth Amendment right to a jury trial.[21] There is no requirement, however, that the petit jury actually seated in a defendant's case mirror the community and reflect the various distinctive groups in the population.[22] It is axiomatic that the State may not deliberately or systematically deny to members of a defendant's race the right to participate, as jurors, in the administration of justice.[23] In order to establish a prima facie case of deliberate or systematic exclusion, a defendant must prove that (1) the group alleged to be excluded is a "distinctive" group in the community; (2) the representation of this group in venires from which the juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) this underrepresentation is due to systematic exclusion of the group in the jury-selection process.[24]

[13]In the present case, Wells had the burden of proving systematic exclusion of members of his racial group from the venire.[25] Only after making a prima-facie case by establishing these three elements could the burden shift to the State to justify its procedure.[26] Wells does not argue that the circuit court deliberately and purposefully excluded African–Americans from the venire. In fact, there were four African–Americans seated as jurors during his trial.

In *Gwathney v. State*,[27] the appellant argued, as Wells does, that the court violated his right to due process by excusing prospective jurors from the jury pool. The court held that Gwathney had failed to show how he was prejudiced by the number of jurors excused. Wells has also failed to show how he was prejudiced. There has been no suggestion by Wells that the number of potential jurors (263), and the number actually appearing (49) "was the result of any attempt to influence the makeup of the jury panel."[28] Accordingly, we hold that the circuit court did not

21. *Lee v. State*, 327 Ark. 692, 942 S.W.2d 231 (1997); *Danzie v. State*, 326 Ark. 34, 930 S.W.2d 310 (1996); *Davis v. State*, 325 Ark. 194, 925 S.W.2d 402 (1996).

22. *See Danzie, supra.*

23. *See Lee, supra; Davis, supra; Sanders v. State*, 300 Ark. 25, 776 S.W.2d 334 (1989).

24. *Lee, supra* (citing *Duren v. Missouri*, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979)).

25. *Mitchell v. State*, 323 Ark. 116, 913 S.W.2d 264 (1996).

26. *Id.*

27. 2009 Ark. 544, 381 S.W.3d 744.

28. *Id.*

err by denying Wells's objection to the jury panel.

Affirmed.

PITTMAN and ABRAMSON, JJ., agree.